ODOM, Justice.
 

 The plaintiff is a political corporation of this state, and prosecutes this petitory action to have its title to the following described lands recognized, to wit:
 

 “In Township 20 South, Range 26 East,
 

 “Sec. 11, 427 acres,
 

 “Sec. 12, 632 acres,
 

 “See. 13, 77 acres.
 

 “The above estimated area is in accordance with lands appearing on the A. E. Wash-burn, C. E., map, making proper allowance for navigable water areas and for lands in the above sections previously patented or conveyed by the state.”
 

 The lands involved are part of a large tract known as “Tidal Overflow Lands,” and originally belonged to the state by virtue of its inherent sovereignty, and were transferred by the state to Buras levee board under the provisions of Act No. 215 of 1908. It will be noted by reference to the above description that plaintiff does not assert title to any designated subdivisions of the sections in which the acreage is located, but seeks recognition of title to 427 acres in section 11, 632 acres in
 
 *699
 
 section 12, and 77 acres in section 13. Plaintiff’s reason for not asserting title to the entire acreage in these sections is that several years prior to bringing this suit it had sold to J. Homer Jordan the following lands:
 

 “In Township 20 South, Range 26 East,
 

 “Sec. 11, 213 acres,
 

 “Sec. 12, 8 acres,
 

 “Sec. 13, 563 acres.”
 

 By simple addition it appears that the acreage now claimed by plaintiff in those sections and that which it had previously sold to Jordan constitute the full acreage of three regular sections of 640 acres each. Or, as counsel for plaintiff say in their original brief (page 4), “The fractional sections sued for constitute the remaining acreage in the sections after deducting the portions of said sections previously transferred by the state .to the Buras Levee Board and sold by the Buras Levee Board to the ancestors in title of the defendants in this suit.”
 

 The defendants are the Mt. Forest Fur Farms of America, which claims to own the land in dispute by title which traces back to J. Homer Jordan, trustee, and certain oil companies holding leases under the same title. Defendants contend that the plaintiff owns no land in Secs. 11, 12, and 13, Tp. 20 S., R. 26 E.; all the lands in said sections having been sold by the levee board to Jordan and subsequently patented to him by the state.
 

 On July 23,1914, the state, through the register of the state land office and the auditor, transferred to the Buras levee district 44,175.-50 acres of land in Townships 19 and 20 South, Range 26 East, and Township 20 South, Range 27 East, including the following:
 

 Two hundred and thirteen acres in Sec. 11,, 8 acres in Sec. 12, and 563 acrgs in See. 13, Tp. 20 S., R. 26 East.
 

 In this deed there is nothing to indicate in what particular portions of these sections the acreage sold is located.
 

 On February 1,1919, the Buras levee board, through the sheriff, sold at public auction to J. Homer Jordan, trustee, the same lands, among them being the following:
 

 N. E.
 
 ¼
 
 Sec. 11, 44 acres,
 

 N. W.
 
 ¼
 
 Sec. 11,14 acres,
 

 S. E.
 
 ¼
 
 Sec. 11, 102 acres,
 

 S. W.
 
 ¼
 
 Sec. 11, 53 acres; total in Sec.' 11, 213 acres.
 

 S. W.
 
 ¼
 
 Sec. 12, 8 acres; total in Sec. 12, 8 acres.
 

 N. E.
 
 ¼
 
 Sec. 13, 93 acres,
 

 N. W.
 
 ¼
 
 Sec. 13, 150 acres,
 

 S. W.
 
 ¼
 
 Sec. 13,160 acres,
 

 S. E.
 
 ¼
 
 Sec. 13, 160 acres; total in Sec. 13, 563 acres, all in Tp. 20 S., R. 26 E.
 

 It will be noted that the acreage in these sections transferred by the state to the levee board is the same as that sold by the levee board to Jordan; the only difference in the description being that in the latter deed the subdivision of the sections in which the land is located is given.
 

 One of the defendant’s contentions is that the state intended to sell, and did sell, to the levee board, all the land in Townships 19 and 20 South, Range 26 East, and that the levee
 
 *701
 
 board in turn intended to sell, and' did sell, to J. Homer Jordan, trustee, all the land it owned in these townships. These lands were transferred by the state to the .levee board and by the board to Jordan in accordance with a plat made by Major Frank T.'Payne, acting as deputy United States surveyor. These plats dated October 12, 1908, were filed in the office of the register of the state land office by Major Payne, and approved by the then Governor, J. Y. Sanders, on April 12, 1912. These plats showed the acreage of land in each and every section, although they did not show, except by general topography, the subdivision of the section in which it was located.
 

 The law which provides for the sale of such lands by levee boards requires that it be sold in quarter sections, with the acreage in each designated. For this reason, a surveyor named De Armas was employed to estimate the acreage in each quarter section, for the purpose of the sale by the levee board. He made no survey of the lands, but took the plats made by Major Payne, and, noting the topography as shown, estimated the land area of each quarter section. His estimate was used by the levee board when it, through the sheriff, sold to Jordan.
 

 A very large percentage of this territory is composed of water. There are various lakes and bays in each of the townships, the beds of which the state did not pretend to sell. All it intended to sell was the land area. Major Payne’s maps and plats showed the boundaries of these lakes and the land area in each section, and, according to his' plats, there were only 213 acres of land in See. 11, 8 acres in Sec. 12, and 563 acres in Sec. 13 in Tp. 20 S., R. 26 E.
 

 It readily appears, therefore, that, according to the Payne maps and plats, the state sold to the levee board, and the board to J. Homer Jordan, trustee, all the land area in these townships, including sections 11,12, and 13.
 

 Jordan paid the levee board cash'for the land at 50 cents per acre, took possession of it immediately, had it placed upon the assessment rolls according to the acreage which he had bought, and he and his successors in title have had it assessed and have paid taxes on it ever since.
 

 ’ The lands acquired by Jordan finally passed by mesne conveyances to the Mt. Forest Fur Farms of America, which granted mineral leases thereon to Earnest Cockerall and the Moran Corporation of the South. These in turn subleased to certain oil concerns with rights to develop. These concerns drilled and brought in several producing oil wells. This was in 1928. These wells were, of course, located on land, and, according to the Payne maps and plats, are in Sec. 25, Tp. 20 S., R. 26 E., which is all land.
 

 After the discovery of oil in 1928, the levee board concluded that the Payne plats, under which it had bought and sold the land, were erroneous, and it employed Mr. A. E. Wash-burn, a civil engineer and surveyor, to resurvey the entire territory. According to his survey and the plats filed by him, sections 11,12, and 13 are practically all land and not water, as shown by the Payne plats; that there are 633 acres in section 11, and 610 acres in each of the sections 12 and 13, as against 213
 
 *703
 
 acres in
 
 section
 
 11, 8 acres in section 12, and 563 acres in section 13, as shown hy the Payne plats.
 

 Accepting the Washburn survey and plats as correct, the levee board set up the contention that the state had failed to convey to it all the lands it owned in those sections, and that, as it had sold only such lands as it had acquired from the state, it followed necessarily. that Jordan’s successors in title, the defendants, do not own all the lands in those sections.
 

 The Washburn survey and plats, together with a certificate made by him, were presented to the register of the state land office, who, on October 9, 1928, issued to the levee board a patent conveying these additional lands ■within the Buras levee district, as shown by the Washburn plats, including the following in Tp. 20 S., R. 26 E.: Section’ 11, 427 acres, section 12, 632 acres, and section 13, 77 acres.
 

 These are the lands which plaintiff claims in this suit; its theory being that they were left out of the original grant made by the state to the board in 1914.
 

 The grant made to the board in 1928 recites that:
 

 “The above estimated area is in accordance with the lands appearing on the Allen E. Washburn, O. E., map.”
 

 The plaintiff, in bringing its suit, alleged that the Washburn plats were correct. It attached them to its petition and made them part of it. But the trial judge seems to have ignored these plats in rendering his judgment He found for plaintiff, “decreeing said plaintiff tq be the;true and lawful owner of the following described property to wit:
 

 “In township 20 S. R. 26 E;
 

 “Sec. 11, 427 acres;
 

 “Sec. 12, 632 -acres;
 

 “Sec. 13, 77 acres, said lands being located on the ground by a resurvey, as shown by plat of the Board of State Engineers filed in this case. Plaintiff Buras 23 and 23a and an enlargement thereof of Secs. 11,12 and 13, T. 20 S. R. 26 East filed as Plf. — Buras #30 and as such entitled to the full and undisturbed possession thereof.”
 

 The defendants appealed from this judgment.
 

 A history of all the transactions connected with these lands must be understood in order to correctly decide the issues involved, and this involves néeessarily the various surveys made by the engineers and the plats filed by them.
 

 If the Payne plats are accepted by the court, then the case is necessarily with defendants, because, according to them, Jordan, trustee, purchased, and his transferees now own, all the land in T. 20 S., R. 26 E., which the state ever owned or could own, and all, that the plaintiff levee board ever owned. We must therefore trace the history of the Payne survey and th'e reason for his making the plats as he did and the reason for his designating-the acreage of land in each of his sections as he did.
 

 The state owns, by virtue of its inherent sovereignty, all tidal overflow lands within its boundaries. It is entitled to receive from the government all so-called swamp lands under the Swamp Land Act of March 2,1849. The lands in this section of the state
 
 *705
 
 are all low; some of them being tidal overflow and owned by the state by virtue of that fact. Some of them are swamp lands as defined by the act of 1849.
 

 The Buras levee district was created by Act No. 18 of 1894, and embraces within its limits all the territory in Tps. 19 and 20 S., R. 26 E. By this act, the state granted to the board of commissioners created for the district “all lands now belonging or that may hereafter belong to the State of Louisiana, and embraced within the limits of the levee district as herein constituted.” (Section 11.) This act was so amended by Act No. 205 of 1910 as to include specifically all lands owned by the state “by virtue of her inherent sovereignty.”
 

 The board of commissioners, at various times, applied to the proper officials of the state for formal grants of the state owned lands within the limits of its district, and formal grants were made so that up to 1908 practically all the surveyed lands in the district were formally transferred.
 

 But there were within the territorial boundaries of the district certain
 
 “unsurveyed lands";
 
 that is, a territory which had never been surveyed by government engineers, and, as a consequence, it was not known whether these lands belonged to the state by virtue of its inherent sovereignty or whether it was entitled to have them transferred to it under the Swamp Land Act of 1849.
 

 This
 
 unsurveyed territory
 
 included Tps. 19 and 20 S., R. 26 E. and Tp. 20 S., R. 27 East. The board of commissioners thought the state either owned, or should own, these unsurveyed lands, and, if so, they should be transferred to the board. Accordingly, the board’s attorney, Mr. Dymond, requested the proper state officials to apply to the national government for a survey and an examination of these lands. The surveyor general’s office complied, and deputized Major Frank T. Payne to do the work and report his findings. Following are the instructions given by the surveyor general to Major Payne:
 

 “By letter dated August 25, 1906, the State of Louisiana, through Hon. A. W. Crandell, Register of the State Land Office, made application to this office for a survey and selection as inuring to the State of Louisiana under the swamp land grant of the unsurveyed lands in the following townships, viz.:
 

 Township 18 South, Range 25 East.
 

 Township 19 South, Range 26 East.
 

 Township 20 South, Range 26 East.
 

 Township 20 South, Range 27 East.
 

 “All in the South Eastern District, Louisiana.”
 

 “Lou are now instructed to proceed to the aforesaid townships, and make the examination of the lands therein, in order to ascertain if there are any lands therein that dp not come within the purview of the swamp land grant of March 2, 1849.”
 

 “The above sketches and field notes, will, I suppose, be sufficient data from which to project your surveys, and enable you to ascertain the proper location of the exterior boundaries of the townships wherein you are to make your examination.
 

 “After having ascertained to your entire satisfaction the proper' location of the exterior boundaries of the townships, you will
 
 *707
 
 make a sufficient examination of the lands in each township, etc., etc.”
 

 “You will then prepare lists (one for each township) of the lands found to he of the character granted, and present the same to this office for action, and you will also deposit in this office all field notes, maps and other papers from which you prepare the said lists.
 

 “The sections in the aforesaid townships should he numbered respectively, beginning with the number one in the northeast section, and proceeding west and east alternately, through the township, with the progressive numbers till the thirty-sixth be completed.”
 

 “You will make the lists of these lands according to the following form, viz.:
 

 “South Eastern District, Louisiana,
 

 “West of Mississippi River.
 

 “You will sign the report of your examination and your maps in your capacity of U. S. Deputy Surveyor, and have your signature identified by the Clerk of Court before transmitting your said report to this office.”
 

 These instructions make it perfectly plain that Payne was not expected to
 
 establish
 
 the boundaries of these unsurveyed townships. These boundaries had long since been established by surveys made by the United States government. The purpose of sending Payne to the territory was to ascertain and report the character of the lands involved, and there was therefore no occasion for his attempting to
 
 establish
 
 the boundaries. It was necessary, however, for him to
 
 locate
 
 these boundaries as already established, in order that he might know the location of the lands to be examined. All that Payne was instructed to do was to proceed to those townships “and make an examination of the lands therein, in order to ascertain if there are any lands therein that do not come within the purview of the Swamp Land Grant of March 2, 1849.”
 

 The Surveyor General sent him “field notes” which he assumed would “be sufficient data from which to project your surveys, and to enable you to
 
 ascertain the proper location of the exterior boundaries
 
 of the township wherein you are to make your
 
 examination.”
 
 The Surveyor General proceeded with his instructions as follows:
 

 “After having ascertained to your entire satisfaction the proper
 
 location
 
 of the exteri- or boundaries of the township, you will make a sufficient examination of the lands,” etc.' (All italics ours.)
 

 Payne went to the territory as directed, examined the lands as far as he could, and made his report His report shows that he understood that he was not to establish the exterior boundaries of these unsurveyed townships, for he says:
 

 “With the data furnished me by your office of surveys made of adjoining townships, under authority from the United States Government, from which to project my surveys and enable me to determine the proper
 
 location
 
 of said townships wherein I was to make an examination'and ascertain if there were any lands therein that came within the pur
 
 *709
 
 view of the swamp land grant of March 2, 1S49, I proceeded,” etc. (Italics ours.)
 

 In order to locate the boundaries of these townships, he used the data, presumably field notes, of the old government surveys sent him by the Surveyor General.
 

 As to Townships 19 and 20 S., R. 26 E., he says:
 

 “In order to
 
 locate
 
 Townships 19-26, 20-26 * * * I began at a meander corner on the south boundary of Township 19 S. R. 25 East (established by me for the Oyster Commission of Louisiana) and ran East (var. 5° 25' East) 34.60 chains where I intersect Bay Baptiste. The south east corner of said Township falling in the bay, which is the south west corner of T. 19 S., R. 26 East, the. township to be examined, I find it impossible to proceed further owing to the condition of the land and numerous bays and bayous.” Following this he says that he examined the lands “by walking over them when possible and by coasting through the many bayous and bays interspersed throughout the entire area.” (Italics ours.)
 

 He does not say, and there is nothing in his report to indicate, that he attempted to do more than locate the lands to be examined by reference to the old surveys as shown by the field notes furnished him. His report shows unmistakably that he did not actually survey and measure the lands, but that he examined them “by walking over them when possible and by 'coasting through the many bayous and bays interspersed throughout the entire area.”
 

 The maps which he made and attached to his report showed the boundaries of the “many bayous and bays” and the land area-of each section in each of the townships. But the information which enabled him to-make this showing was not obtained by him. from his examination, for he says:
 

 “The maps forming part of this report have been compiled from data furnished me by the United States Coast Geodetic Depart-' ment and from surveys made by me for the Oyster Commission of Louisiana.”
 

 He reported that he found the lands “to be an almost impassable marsh, subject to tidal overflow, and in their present condition, • utterly worthless.”
 

 Upon receipt of this report and the maps, the Commissioner of the General Land Office-at Washington ruled that the lands lay below the high-water mark of the Gulf of Mexico and were owned by the state by virtue of its inherent sovereignty, and so informed-the state authorities.
 

 As we have stated, Payne’s maps were filed at the office of the register of the state land, office at Baton Rouge, and were approved by the Governor in April, 1912.
 

 Accepting these maps as correct, and using them as a “basis for a transfer, the state, through the proper officers, transferred the lands to the levee board.
 

 The levee board then had De Armas make an estimate of the acreage of the land in each' quarter section as a basis for its sale. De Armas made no survey, but took Payne’s maps, which showed by clear outlines the location of the boundaries of all the lakes and bays as well as the number of acres in each section. By locating the lakes and bays on Payne’s maps, De Armas was able to de
 
 *711
 
 termine the exact location of the land in each section and the acreage in each quarter section. The total of the acreage in each quarter section- equalled exactly the whole acreage as shown by the Payne plats. The levee board used the De Armas estimates as a basis for. its sale, and therefore the Payne plats formed the basis for the transfer, and were relied upon by the state when it transferred to the -board and by the board when it sold to Jordan.
 

 The levee board now repudiates the Payne map and his plats, and seeks to have the court hold that it is not -bound by them.
 

 ' As a basis for its present claim, it had the two townships resurveyed, and, with reference to the Payne plats, to quote the district judge, had “an enlargement thereof of Secs. 11, 12 and 13, T. 20 S. R. 26 East” made, and in fact an “enlargement” of each and every section in the township.
 

 As a result of their resurvey and this “enlargement,” and according to the recent maps and plats made by Washburn and approved by the board of state engineers, sections 11, ■12, and 13 have been, figuratively speaking, pulled down south more than a°mile from where the Payne map locates them, and incidentally pulled out of the water onto land and placed on the exact spot where oil was discovered.
 

 The oil wells were, of course, drilled on land and not in water. Their location on the ground is in' section 25, according to the Payne survey. This entire section 25 is land, and is undeniably owned by these defendants. So, if the Payne survey and plats are to be accepted, the land and the oil beneath it belong to defendants and not to plaintiff; the oil dome being now where it has always been and where it ever will be.
 

 Defendants own but little land in sections 11, 12, and 13, as located by Payne. Practically all of those sections are in Lake Grande Ecaille. So, if plaintiff is to be decreed the owner of the oil dome, the location of sections 11, 12, and 13 on the ground must be changed, and that is what it is trying to do.
 

 According to the resurvey and “enlargement” of these sections, their location on the ground is, shifted so that the sections are all land, and the state, after their resurvey by Washburn in 1928, transferred to the levee board all the land in them except the small fractions sold to Jordan according to the Payne plats.
 

 How the Controversy Arises.
 

 The record establishes beyond question that the exterior boundaries of Townships 19 and 20 S., R. 26 E., were established by United States surveyors, some of them as early as 1831. As shown by plat marked “Buras 19a,” the north boundary line of the so-called “unsurveyed area” is the south boundary line of Tp. 18 S., R,, 26 E. This line was established by John W. Watson, a United'States surveyor, in 1831. The west boundary line is the east line of Tps. 19 and 20 S., R. 25 E., as surveyed by Rightor & Mc-Cullom in 1840. The south boundary line is the north line of TP- 21 S., R. 26 E., as established by Geo. T. Connelly in 1837, and the east boundary is the west line of Tps. 19 and 20 S., R. 27 E., as established by John W. Watson in 1831. There were some resurveys'
 
 *713
 
 of these lines later on, but their location was never changed.
 

 According to this map, the unsurveyed territory consisting of two so-called townships, that is, Tps. 19 and 20 S., R. 26 E., is a parallelogram 6 miles east and west by 9 miles north and south.
 

 Under the rules of surveying, a township is 6 miles square, and therefore one would expect, where two townships lie adjacent, to find a parallelogram 6 by 12 and not 6 by 9 miles.
 

 The discrepancy in this case arises from the fact that, when Geo. F. Connelly surveyed Tp. 21 S., R. 26 E., he established its north line 3 miles north of where it should have been according to the ordinary rules of surveying. This was due to a mistake which is explained in the record, the details of which need not be recited.
 

 But the fact is that the mistake was made and that he did establish this line 3 miles north of where it should have been. The same mistake was made by Rightor & McCullom when they surveyed Tp. 21 S., R. 27 East, in 1840. Their north line of that township, if extended west, would fall exactly where Connelly puts the north line of Tp. 21 S., R. 26 E. This is plainly shown «by the map “Buras 19a.”
 

 These anciently established lines form the boundaries of this “unsurveyed territory.” These lines cannot now be changed for several reasons: First, they were established by United States government surveyors nearly a century ago, and, while some of them on various occasions have been resurveyed, their location was never changed. The second is that the United States government has recognized them on various occasions by transferring to the state portions of each of the surrounding surveyed townships under the Swamp Land Grant of 1849. The third is that the state 'and this levee board have recognized them, the state by transferring lands to the levee board and the levee board by accepting the sales according to these surveys. And, fourth, the levee board, after acquiring lands in the adjoining townships according to these surveys, has sold portions of the lands thus acquired.
 

 As shown by the record, volume 19, the board, by notarial act passed before J. C. De Armas on January 26, 1904, sold to Geo. T. Shaw 55,978 acres of land located in each of the townships which surround and bound this “unsurveyed territory.”
 

 This sale included 8,730 acres in TP- IS S., R. 26 E., the south line of which admittedly forms the north boundary of the area involved, and 4,360 acres in Tp- 21 S., R. 26 E., the north line of which, as established by Connelly in 1837, forms the south line of the unsurveyed area.
 

 It therefore does not matter what Payne used as a starting point when he went out to “examine” these lands or whether he went by any starting point at all. The fact is that he had only a limited area to examine and that area had fixed boundaries which could not be disregarded.
 

 Payne’s report shows that he made no measurements of this area. He knew, of course, that Watson had established the south boundary of Tp. 18 S., R. 26 E., and that Connelly had established, the north
 
 *715
 
 boundary of Tp. 21 S., R. 26 E., and he knew, furthermore, that he was to examine and report the character of the land in the two intervening townships; that is, Tps. 19 and 20. Not having measured them, and evidently not knowing that Connelly’s line was 3 miles north of where it should have been, he naturally assumed that the territory which he had to examine was a parallelogram 6 miles east and west by 12 miles north and south. He therefore made a desk or office plat of this territory, dividing it into 72 equal portions, which he designated as sections. His plats show 36 of these sections in each township, beginning his numbering in the northeast comer of the township and running alternately west and then east in the usual way.
 

 His so-called sections are necessarily short because it is impossible to carve 72 full sections one mile square out of a rectangle 9 by 6 miles. There was a shortage in the total area platted, and this shortage must be prorated; each section bearing its pro rata of the loss. C. C. art. 851.
 

 These plats were filed, approved by the Governor, and became official documents. By reference to them, the state transferred to the board and the board sold to Jordan. Whatever else may be said about them, the fact is that they showed every acre of land in the territory. The boundary lines of the lakes and bays were clearly and unmistakably delineated upon them. This is not disputed, for the topography of the land was designated by reference to surveys and maps made by the United States Coast Geodetic ^Department.
 

 With these maps before them, the register of the state land office and the auditor knew just how many' acres of land the state had to transfer to the levee board, and the board in turn knew how many acres it had to sell.
 

 The lines and sections within the territory, which the state had to grant to the board and which the board had to sell, may be shifted and juggled by resurveys, and enlargements, at will, but such shifting and juggling cannot possibly add to or subtract from that territory one square acre of land. The acreage remains the same, it matters not whose or what kind of a map may be used for the computation.
 

 Now these are some of the outstanding and indisputable facts:
 

 (1) The state owned certain lands which it transferred to the levee board. These lands were in an unsurveyed territory, the boundaries of which having been established by United States government surveys which the state had recognized and accepted by receiving grants of land in the surveyed townships under the Swamp Land Act, and by subseqently conveying these lands to the levee board, all by reference to the ancient surveys.
 

 (2) The levee board owned the same land by virtue of the grant from the state in 1918, and had recognized and accepted the old surveys which bounded the territory by accepting the grant and by selling lands in each of the surrounding surveyed townships to private individuals, all as per these ancient surveys.
 

 (3) The north line of Tp. 21 S., R. 26 East, as established by Connelly, which line formed the south boundary of the unsurveyed territory, had been established 3 miles north of where it should have been, and this line had
 
 *717
 
 been recognized and accepted by tbe levee board; it having accepted from the state a grant of 12 sections in Tp. 21 S., R. 26 E., as surveyed by Connelly, and having sold to Geo. T. Shaw more than 4,000 acres of this land, all as per the survey of that township by Connelly.
 

 (4) The territory which Payne was ordered to examine, and which he did examine, had established boundaries and was a parallelogram 6 by 9 miles.
 

 (5) That Payne subdivided this territory into Seventy-two equal parts as shown by the plats which he made and filed, and which were approved, and that the state granted to the board and the board sold to Jordan according to these plats.
 

 (6) The Payne plats definitely delineated the shore lines of lakes and bays within the territory surveyed, and from them the land area therein could be estimated with reasonable accuracy. De Armas, employed by the levee board, did estimate this land area or acreage for the board as a basis for the sale, and the board advertised for sale and sold to Jordan, trustee, the entire acreage shown by the Payne plats and estimate by De Armas.'
 

 (7) The state intended to grant, and did grant, to the levee board, and the board intended to sell, and did sell, to Jordan, trasteé, all the land area within this parallelogram 6 by 9 miles, all according to the Payne plats, this being apparent, because the state was obligated under legislative enactment to transfer all its lands of this character to the board; the purpose of the board being to get all it could for its property.
 

 (8) It is immaterial to the state, to the levee board, or these defendants whether the Payne plats showed ideal or full sections, or whether they showed short or irregular sections; the fact being that they did show all the land acreage in the entire territory.
 

 It therefore follows that now, because the sections shown on the Payne plats must necessarily be short, the levee board has no right in law, and certainly none in equity, to arbitrarily have this territory resurveyed and the sections shown by the Payne plats “enlarged” for the purpose of shifting their position on the ground so as to make sections 11, 12, and 13 cover the exact spot where oil was discovered.
 

 Counsel for plaintiff in their supplemental brief, pp. 34 and 35, attempt to show that the levee board did not intend to sell, and did not sell, all the land it owned in this territory. In support of their contention, they refer to the fact that no tracts were sold to Jordan, trustee, in Secs. 2, 16, and 20 of Tp. 19 and Secs. 1 and 16 in Tp. 20.
 

 As to sections 16, these were never owned by the board. All sixteenth sections are reserved by the government for the schools.
 

 As to the others, all the maps show that the whole of Secs. 3 and 20, Tp. 19, are in Bake Batise* and that the whole of Sec. 1, Tp. 20, is in Lake Grande Eeaille.
 

 Counsel also point to the fact that no lands were sold to Jordan in certain quarter sections of Secs. 4, 5, 8, 9, 17, 20, 30, and 36 in Tp. 19 and Secs. 2, 4, 5, 6, 8,10, 12, 28, 29, 30, 31 and 32, Tp. 20. The maps show that each of the quarter sections mentioned is entirely' within either Lake Baptiste or Lake Grande Eeaille. Hence no sale, of course. No other reason is suggested in support of their conten
 
 *719
 
 tion that the board did not intend to sell all the land it owned in these townships.
 

 We again refer to Connelly’s survey of Tp. 21 S., R. 26 E., the north line of which forms the south line of Tp. 20, or the south line of the unsurveyed territory.
 

 The questions whether Connelly’s line was recognized and whether it was in fact located 3 miles too far north, are extremely important factors in this ease, because, if this line is in its right place, then the urisurveyed territory •was a parallelogram 6 by 12 miles instead of 6 by 9 miles.
 

 What we have already said as to these points should be sufficient. But, if further proof be needed, it is furnished by plaintiffs, who say in’their original brief at page 16:
 

 “But Connelly protracted fractional Township 21 S. R. 26 E, north from his meander of the Gulf shore and it was accepted by the United States General Land Office, and became an official survey. Similarly, the Connelly survey of T. 21 S. R. 25 E. and T. 21 S. R. 8 E. were accepted and approved
 
 although three miles too far north.”
 
 (Italics ours.)
 

 Furthermore, Washburn, who made the resurvey for the levee board, recognized this line on his maps. What Washburn did, to quote the supplemental brief filed by counsel for plaintiff at page 40,
 

 “Was to put the Payne survey of T. 20 S. R. 26 E. in its proper place in the rectangular system of surveys of the United States Land Office,
 
 hut without extending the sections of the touynshvp helow the Connelly line
 
 where the conflict and overlap exist.” (Italics ours.)
 

 On Washburn’s map, he showed 36 full sections in Tp. 19 S., R. 26 E., but only 18 sections in Tp. 20 S., R. 26 E., just half the number which would have been in that township had it been the regular size. To quote counsel’s brief further (same page):
 

 “Washburn did not show the overlap of T. 20 S. R. 26 E. with the Connelly survey of T. 21 S. R. 26 E., but contented himself with extending T. 20 S. R. 26 E. to the Connelly line, putting sections 1 to 18 of T. 20 S. R. 26 E. in their proper place qnd leaving off sections 19 to 36 of T. 20 S. R. 26 E.”
 

 We take it, therefore, that it is not now disputed by plaintiff that the Connelly line was recognized and 'that it in fact is 3 miles too far north, and, that being conceded, it must also be conceded that the unsurveyed territory was in fact only 6 by 9 miles.
 

 The plaintiff filed its suit to be recognized as the owner of the lands involved on the showing made by the Washburn map, and made that map a part of its petition. But, as that map recognizes the Connelly survey, and realizing that the Payne plats did divide the unsurveyed area into 72 parts, counsel now contend and attempt to show that Payne’s plats actually show a subdivision of two full townships, each with 36 full sections, one mile square, and that, so far as the Payne survey and plats are concerned, the Connelly line should be disregarded altogether, or, to state it as counsel put it in their supplemental brief, p. 40, “this Connelly line does not bound the Payne survey, but conflicts with it:”
 

 This contention is wholly untenable. It is not supported by the record. All the maps show that the east and west line which forms
 
 *721
 
 the south boundary of the territory surveyed and platted by Payne runs through some portions of land, and that there is land to the south of it. This fact is so obviously true that it need only be stated. All the maps show it.
 

 The maps further show that the topography of the territory traversed by Payne’s east and west line which forms the south boundary of the maps corresponds exactly with that traversed by the Connelly line. The same parts of land, such as peninsulas and nooks, are crossed by each of the lines and crossed at the same place.
 

 The maps and surveys also show unmistakably that, if Tp. 20 S., R. 26 E„ were projected far enough south to make it 6 miles square, it would extend approximately a mile out into the Gulf of Mexico. Therefore, if Payne had intended to disregard the Connelly line and extend his survey so as to include a full township, his plats could not have shown lands to the south.
 

 It is manifestly clear to us that Payne intended to make the Connelly line his south boundary line.
 

 Furthermore, if Payne did in fact disregard the Connelly line, and if in fact his plats do show 72 full sections each one mile square, there would have been no change made in the location of his section lines by the resurvey made by Washburn; the sections would not have been “enlarged”; the resurvey could have done no more than retrace Payne’s section lines, and Washburn’s sections would have occupied the same place on the ground as Payne’s did. There would have been no shifting of positions, and therefore no advantage gained by plaintiff. Hence, why a resurvey?
 

 For the reasons assigned, the judgment appealed from is reversed and set aside, and it is now, ordered that the writs of sequestration and injunction sued out herein be dissolved, that plaintiff’s demands be rejected, and that its suit be dismissed at its costs in both courts.
 

 BRUNOT, J., dissents and hands down reasons.
 

 ST. PAUL, J„ dissents.
 

 ROGERS, X, dissents, concurring in dissenting opinion of Mr. Justice BRUNOT.