132 So.2d 721 (1961)
OLIN GAS TRANSMISSION CORPORATION et al.,
v.
Walter J. HARRISON et al., and STATE of Louisiana et al.
No. 5339.
Court of Appeal of Louisiana, First Circuit.
June 30, 1961.
Rehearing Denied September 25, 1961.
Certiorari Denied November 6, 1961.
Jack P. F. Gremillion, Atty. Gen., John L. Madden, Marc Dupuy, Asst. Attys. Gen., for appellants.
Henican, James & Cleveland, Chaffe, McCall, Phillips, Burke & Hopkins, New Orleans, Harvey Peltier and Donald Peltier, Thibodaux, for appellees.
Before ELLIS, LOTTINGER, HERGET, JONES and LANDRY, JJ.
ELLIS, Judge.
This is a concursus proceeding instituted by Olin Gas Transmission Corp., H. L. Hunt, and Secure Trusts Nos. 1, 2, 3, 4 *722 and 5, represented by Sidney Lathan, Trustee (hereinafter referred to collectively as "Olin"). Walter J. Harrison, William H. Harrison, Mrs. Lydia Harrison Courturie and John Pitre (hereinafter collectively called "The Harrisons"), as private claimants who oppose the State of Louisiana, joined by the State Mineral Board and the Register of the State Land Office (hereinafter referred to as "The State"), in a contest for funds on deposit and to be deposited in the Registry of the Court in this proceeding.
At the commencement of these proceedings, the funds deposited in the Registry of the Court represented Royalties from the sale of oil produced from a well located in the bed of Round Lake, particularly in the southern or southwestern portion thereof. Round Lake is situated in Sections 3, 4, 9 and 10, Township 20 South of Range 23 East, Lafourche Parish, Louisiana within the Southeast Land District of Louisiana West of the Mississippi River. The well was located in the Northwest Quarter of Section 9, Township 20 South, Range 23 East. This well was not unitized and, consequently, Olin alleged that it held an oil, gas and mineral lease from the State of Louisiana covering the beds and bottoms of all state-owned water bodies in Section 9, and that it held a lease from the Harrisons covering all of said Section.
The Harrisons answered the original petition and joined issue on all water bottoms of Section 9, tracing their alleged title from state patents and mesne conveyances, denying the existence of Round Lake in 1812 and the navigability of such lake from 1812 to the present time, and pleading the prescription of six years under Act 62 of 1912, LSA-R.S. 9:5661.
John Pitre responded to said petition, following generally the allegations of the Harrisons' answer, asserting title to the Harrisons, and claiming an undivided 1/150th interest from production, as evidenced by an alleged transfer of such interest to him by the Harrisons.
The state then answered the original petition, alleging that the waters of Round Lake, within the limits aforementioned, were navigable in 1812 when Louisiana was admitted as a state into the Union, and alternatively pleading that if it not be established that Round Lake was navigable in 1812, said water body has since become navigable, and that in either event the bed of Round Lake was owned by the State by virtue of its inherent sovereignty.
Depositions were thereafter taken on March 26, 1957, the testimony being limited, as far as counsel could reasonably control it, to those water bottoms lying in Section 9, Township 20 South, Range 23 East, involved in the proceedings, as reflected in the original petition. This well located in Section 9, originally productive of oil, is now depleted, having produced from February, 1956 to January 14, 1957.
After the discovery of the oil well in Section 9, Olin discovered the Lake Enfermer gas field and on May 1, 1956, the Commissioner of Conservation established by Order 340, seven gas units embracing areas within Sections 2, 3, 4, 9, 10 and 11 and 15, Township 20 South, Range 23 East, and Sections 33, 34 and 35, Township 19 South, Range 23 East, and the units were denominated 1 through 7. Based upon such unit configurations, voluntary unitizations coexistent with Conservation Commissioner's Orders were executed by all parties in interest, including the Harrisons and the State, acting through the State Mineral Board. It was undertaken in such voluntary unit agreements to point out the area in ownership dispute and to allocate proportionate participation to same.
In August, 1957 Olin decided to amend its petition in the suit then pending and to file two additional concursus proceedings, in order to deal with disputed or contested areas throughout the seven units. Olin's supplemental and amending petition brought the disputed areas of Units 5 and 6 into the controversy pending in Suit 12,016.
*723 Olin's alleged lease from the Harrisons included the lands in Units 5 and 6, and the applicable state leases involving such units, in addition to State Lease No. 2767, were State Leases Nos. 2094 and 2907. Such leases were introduced in evidence in the trial of this suit.
Answering the supplemental and amending petition, the Harrisons traced their alleged title to the areas added by reference to state patents and denying the past and present navigability of the water bodies within Units 5 and 6. The state answered the supplemental and amending petition in November, 1957, but John Pitre did not answer the supplemental and amending petition until after depositions were taken on March 26, 1958. These depositions were divided into two parts, one dealing with water bodies involved in Suit No. 12,016 and the other with those pertaining to Suits Nos. 12,563 and 12,564. We are now concerned with the former only.
The state answered Olin's supplemental and amending petition, averring that State Leases Nos. 2767, 2094 and 2907 covered the water bottoms included in the original and supplemental and amending petitions, admitting the existence of Units 5 and 6 and the execution of voluntary unitization agreements co-extensively with the order of the Commissioner of Conservation, claiming title to all of the water bottoms embraced in Units 5 and 6, based upon the navigability of such water bodies in 1812 when Louisiana was admitted as a state into the Union, and in the alternative pleading that, should the court find that such water bodies were not navigable in 1812, the same had since become navigable and that the beds thereof belonged to the state by virtue of its inherent sovereignty.
John Pitre's answer to Olin's supplemental and amending petition, followed in all material and substantive respects the answer of the Harrisons to said petition, alleging the ownership of the area or areas in dispute to be vested in the Harrisons, and claiming an undivided 1/150th interest in all production from the area involved, based upon an alleged transfer of such interest to him by the Harrisons. The State filed a supplemental and amending answer to both Olin's original and its supplemental and amending petitions, interposing a special plea of estoppel against the Harrisons and adding an alternative plea that the record in the suit of Harrison v. Grandison Company, Civil Action No. 292, United States District Court of the Eastern District of Louisiana, 51 F.Supp. 768, made an exhibit in the state's supplemental and amending answer, be accepted, and considered with the other evidence in the pending suit.
After trial on the merits, the lower court awarded judgment in favor of the Harrisons and against the State holding "that the beds and bottoms of Round Lake and of the streams to the north within Unit No. 5 of Order No. 340 of the Department of Conservation, as well as the beds and bottoms of the streams running north of Round Lake located within Unit No. 6, created by said Order No. 340 of the Department of Conservation, belonged to the Harrisons". From this judgment the State has prosecuted this appeal contending that the lower court erred in the following respects:

Specification of Errors
1. In failing to adjudicate on all of the RES, or the ownership of all of the funds deposited in the Registry of the Court in this proceeding, and on all of the issues between claimants.
2. In rejecting the State's Plea of Estoppel and its Alternative Plea and in excluding from evidence the record of the case of Joseph deFuentes Harrison v. The Grandison Company, C. A. No. 292, U. S. District Court, Eastern District of Louisiana, 51 F.Supp. 768.
3. In not applying the proper tests of navigability in passing on the water *724 beds involved in this proceeding and in failing to pass upon the navigability of each water body separately, each differing from the other on the basis of the testimony.
4. In not giving adequate weight to all the testimony offered on the issue of present day navigability and in pretermitting the fact and effect thereof.
5. In misinterpreting and incorrectly applying Act 62 of 1912 (R.S. 9:5661) as regards the patents offered in evidence herein by the private claimants in this proceeding.
For purposes of clarity the assignment of alleged error on the part of the trial judge will be treated separately, but not necessarily in the order presented.

The State's Motion to Remand
Counsel for the State contends that the trial judge failed to determine the ownership rights in the proceeds from the well located in an arm or inlet of Round Lake within the NW ¼ of Section 9, Township 20 South, Range 23 East. Further, counsel for the State contends that the ownership of all water bottoms located in Section 9 were at issue including the bottoms of Palmetto Bayou, Bay Rambo, and Lasseigne Lane, and that the trial court only decided the ownership of the water bottom of Round Lake.
Strictly speaking of the funds in dispute, we find that said funds represent royalties from three producing wells. Funds from the non-unitized well now depleted, located in Round Lake were the object of the original concursus proceedings. Funds from wells located in Units 5 and 6 to the north of Round Lake were the object of the supplemental and amended petition of Olin.
The District Court decreed as follows:
"It Is Ordered, Adjudged and Decreed that there be judgment in favor of plaintiffs, Olin Gas Transmission Corporation, H. L. Hunt, Secure Trust No. 1, 2, 3, 4 and 5, and William Herbert Hunt, Testamentary Executor of the Estate and Lyda Bunker Hunt, decreeing that the amounts heretofore deposited in the Registry of this Court by plaintiff, as well as any amounts hereafter deposited herein, shall be and remain in full settlement and satisfaction of plaintiffs' obligation for, the plaintiffs be and they are hereby relieved from any liability to the extent of funds deposited or to be deposited herein, for the payment of the royalties allocable to: (Italics ours.)
"(a) 109.33/423.46 of 7/48ths of the total production from Unit #5 created by Order No. 340 of the Department of Conservation, being the amount of production from Unit #5 actually in dispute between the parties; and
"(b) 3.45/414.66 of 7/48ths of the total production from Unit #6 created by Order No. 340 of the Department of Conservation, being the amount of production from Unit #6 actually in dispute between the parties.
"(c) With respect, however, to any amounts hereafter deposited, the rights of the owners of said interests on account of which said deposits are made from time to time, to question the correctness of said deposits is hereby and herein specifically reserved.
"It Is Further Ordered, Adjudged and Decreed that the beds and bottoms of Round Lake and of the stream to the north within Unit No. 5 of Order No. 340 of the Department of Conservation, as well as the beds and bottoms of the stream running north of Round Lake located within Unit No. 6, created by Said Order No. 340 of the Department of Conservation, be, and they are hereby, decreed to belong to *725 the following parties in the following proportions, to-wit: (Italics ours.)

"Walter J. Harrison 149/450
"William H. Harrison 149/450
"Mrs. Lydia Harrison Couturie 149/450
"John Pitre 3/450

"It Is Further Ordered, Adjudged and Decreed that as owners of the beds and bottoms of Round Lake and the stream to the north thereof within the said Unit No. 5 and of the stream to the north of Round Lake within the said Unit No. 6, the amounts deposited and to be deposited herein by plaintiffs shall belong and be paid to, after deducting the proper costs of court in connection with this concursus proceeding, the following persons, in the following proportions, to-wit: (Italics ours)

"Walter J. Harrison 149/450
"William H. Harrison 149/450
"Mrs. Lydia Harrison Couturie 149/450
"John Pitre 3/450

"It Is Further Ordered, Adjudged and Decreed that the costs of these proceedings which have not heretofore been deducted from the amounts deposited herein, shall be deducted from said amounts so deposited before distributing the net amounts in accordance with this judgment."
From the above quoted portions of the decree it is obvious that the District Court awarded the royalties from the well located in Round Lake to the parties in the proportions set out in the decree, although the exact amount of money from said well was not mentioned. The well was not unitized and it is clear to our minds that the royalties from the well in Round Lake were decreed to be distributed 149/450 to Walter J. Harrison, 149/450 to William H. Harrison, 149/450 to Mrs. Lydia Harrison Couturie, and 3/450 to John Pitre subject to the deductions therein set out.
The State next contends that the ownership of water bottoms of Palmetto Bayou, Lasseigne Lane, and Bay Rambo, insofar as they are also located in Section 9, were at issue in the proceedings and that the trial judge failed to determine their ownership.
In the original petition of Olin Gas Transmission Corporation et al., it was alleged in Articles 5 and 6 that:
Petitioners show that the lease from Walter J. Harrison, William H. Harrison and Mrs. Lydia Harrison Couturie, referred to above, covers all of Section 9, Township 20 South, Range 23 E, and the aforesaid oil, gas and mineral lease No. 2767 from the State of Louisiana purports to cover alleged water bottoms within Round Lake, lying within Section 9, and that, therefore, there is a controversy between these parties respecting the ownership of the said alleged water bottoms. (Italics ours.)
"Petitioners allege that they have drilled a producing oil well lying within the NW¼ of Section 9, Township 20 S, Range 23 E, according to the official plat of survey of said township approved August 2, 1872, that said well, being designated as Olin Gas Transmission CorporationH. L. HuntWalter J. Harrison et al State Lease No. 2767 Well # 1, is located within an arm or inlet of Round Lake, and therefore that said well is located within an area which is subject to the controversy between Walter J. Harrison, William H. Harrison, Mrs. Lydia Harrison Couturie on the one hand and the State of Louisiana on the other hand."
In the supplemental and amended petition of Olin Gas Transmission Corporation et al. it was alleged in Article 5 that:
"By amending Paragraph 5 to read as follows: Petitioners show that the lease by Walter J. Harrison, William H. Harrison and Mrs. Lydia Harrison *726 Couturie, referred to above, covers all of Sections 3, 4, 9 and 10 of Township 20 S, Range 23 E, and the aforesaid oil, gas and mineral leases Nos. 2767, 2094 and 2907 from the State of Louisiana purport to cover alleged water bottoms within Round Lake and the stream running north from Round Lake, lying in said Sections 3, 4, 9 and 10 and that, therefore, there is a controversy between these parties respecting the ownership of the said alleged water bottoms." (Italics ours.)
Although there is some evidence in the record concerning Bay Rambo, Lasseigne Lane and Palmetto Bayou, it appears that such was in connection with the issue of navigability of Round Lake and its connection with the Gulf of Mexico. From the pleadings and the proof offered in support thereof it is apparent that the disputed area consisted of Round Lake where an oil well had produced certain royalties and the areas to the North where producing wells were located.

Navigability
The principal contention of the State is that the water bodies at issue in this case were navigable in 1812, or have since become navigable, and in either event the beds thereof are owned by the State by virtue of its inherent sovereignty.
The Harrisons trace their title to the area in controversy to several patents issued by the State of Louisiana on July 2, 1901. The Harrisons acquired the property on August 28, 1929 by mesne conveyance, and it appears from the record that the State has consistently collected taxes on all the Harrison lands included in the disputed area.
Pretermitting for the moment the relative importance of the issue of navigability, since both the record and the State's brief are devoted in a large part to this issue, we deem some discussion of this question important.
There appears to be no great dispute between counsel for the State and counsel for the Harrisons as to the proper law on the test of navigability. However, there is a great difference between counsel as to the facts applied to the law.
Counsel for the State has very ably set out some of the criteria used to determine navigability as follows:
"It has long been the rule approved by the Supreme Court of the United States and the Supreme Court of Louisiana that the true test of navigability of water bottoms is that streams or lakes which are navigable in fact must be regarded as navigable in law; that they are navigable in fact when they are used, or are susceptible of being used, in their natural and ordinary condition, as highways of commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. This is so fundamental a rule of law as not to require citation of authority therefor. Many cases have held that the fact that uses of waters have been of more private than public, commercial nature cannot be regarded as controlling. Neither is the extent of existing commerce whether private or public, the test. The question of susceptibility, in the ordinary condition of the waters, rather than the extent of actual use is the crucial question. That was exactly the question before the Supreme Court of the United States in the case of United States v. State of Utah, 283 U.S. 64, 51 S.Ct. 438 [75 L.Ed. 844], which held:
"` * * * The Government insists that the uses of the rivers have been more of a private nature than a public commercial port. But, assuming this to be the fact, it cannot be regarded as controlling when the rivers are shown to be capable of commercial use. The extent of existing commerce is not the cost. The evidence of the actual use of *727 streams, and especially of extensive and continued use for commercial purposes may be most persuasive, but, where conditions of exploration and settlement explain the infrequency or limited nature of such use, the susceptibility to use as a highway of commerce may still be satisfactorily proved. As the court said, in Packer v. Bird, 137 U.S. 661, 667, 11 S.Ct. 210, 211, 34 L. Ed. 819: "It is, indeed, the susceptibility to use as highways of commerce which gives sanction to the public right of control to the exclusion of private ownership, either of the waters or the soils under them." In Economy Light and Power Company vs. United States, 256 U.S. 113, 122, 123, 41 S.Ct. 409, 412, 65 L.Ed. 847, the court quoted with approval the statement in The Montello, [20 Wall 430, 22 L.Ed. 391], supra that "the capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use."'
"The Supreme Court of the United States reiterated this principle in the case of United States v. Appalachian Electric [Power] Company, 311 U.S. 377, 71 [61] S.Ct. 291 [85 L.Ed. 243], holding:
"`Nor is the lack of commercial traffic a bar to a conclusion of navigability where personal or private use by boats demonstrates the navigability of the stream for a simpler type of commercial navigation * * *'
"The foregoing principles of law were reiterated by the Louisiana Supreme Court in the case of State v. Jefferson Island Salt Mining Company, 183 La. 304, 163 So. 145, citing many authorities for so basic a proposition. The State of Louisiana follows the rule laid down by the Supreme Court of the United States on navigability, not any special formula peculiarly adaptable to Louisiana, (State v. Sweet Lake Land [and Oil] Company, 164 La. 240, 113 So. 833).
"American Jurisprudence, Vol. 56, Sec. 179, P. 649, verbo waters recites the general rule:
`Navigability, in the sense of actual usability for navigability or navigability in fact, as a legal concept embracing both public and private interests, is not susceptible of definition or determination by a precise formula which fits every type of stream or body of water under all circumstances and at all times. A general definition or test which has frequently been approved is that rivers or other bodies of water are navigable when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade or travel are or may be conducted in the customary modes of trade and travel on water.'
"This general rule has been followed and applied in numerous cases by the Supreme Court of the United States, including United States v. Appalachian Electric Power Co., 311 U.S. 377 [61 S.Ct. 291, 85 L.Ed. 243]; United States v. [State of] Oregon, 295 U.S. 1 [55 S. Ct. 610, 79 L.Ed. 1267]; United States v. [State of] Utah, 283 U.S. 64 [51 S. Ct. 438, 75 L.Ed. 844]; United States v. Holt State Bank, 270 U.S. 49 [46 S. Ct. 197, 70 L.Ed. 465]; Brewer-Elliott Oil and Gas Co. v. United States, 260 U.S. 77 [43 S.Ct. 60, 67 L.Ed. 140]; Economy Light and Power Co. v. United States, 256 U.S. 113 [41 S.Ct. 409, 65 L.Ed. 847] and Donnally [Donnelly] v. United States, 228 U.S. 243 [33 S.Ct. 449, 57 L.Ed. 820]. This rule has also found support in Louisiana jurisprudence: State v. Sweet Lake Land & Oil Co., 164 La. 240, 113 So. 833; State ex rel. Board of Com's of Atachafalaya [Atchafalaya] Basin Levee District v. Capdeville, 146 La. 94, 83 So. 421, certiorary den[ied] 252 U.S. 581 [40 S.Ct. 346, 64 L.Ed. 727]; State v. Jefferson *728 Island Salt Mining Co., Inc., 184 [183] La. 304, 163 So. 145.
"The Supreme Court of the United States has held that conditions of exploration and settlement of an area explain the infrequency or limited nature of such use as highways of commerce, and that lack of commercial traffic is not a bar to a conclusion that a waterbody is navigable where personal or private use by boats demonstates the availability of the stream for the simpler types of commercial navigation, for it is not solely the extent of commerce that is controlling, but rather the availability for navigation, United States v. Appalachian Electric Power Company, 311 U.S. 377 [61 S.Ct. 291, 85 L.Ed. 243]. * * *
"* * * It is the capability of use by the public for purposes of transportation and commerce which is the true criterion of the navigability of a waterbody, rather than the extent of manner of that use, so held the Louisiana Supreme Court in State v. Jefferson Island [Salt] Mining Co., Inc., 183 La. 304, 163 So. 145. This is true even though the extent of and manner of use is limited because of difficulty of free navigation by natural barriers such as rapids, sandbars or accumulation of timber forming rafts, Goodwill v. Police Jury of Bossier Parish, 38 La.Ann. 752. * * * A water body does not have to be navigable at all times, for `navigability in the sense of the law is not destroyed because the water course is interrupted by occasional natural obstructions * * * nor does the mere fact of the presence of sandbars causing impediments to navigation establish the character of a river as nonnavigable;' thus is the rule stated in American Jurisprudence Vol. 56, Sec. 182, page 649. Even if a water bottom should be devoid of water for brief periods of time, this does not render it non-navigable in law, Sapp v. Brasier [Frazier], 51 La.App. 1718, 26 So. 378." (All Italics by the State omitted.)
From the record it appears that Round Lake is presently a body of water approximately one mile in length and three-fourths of a mile in width. Its depth varies according to whether the wind is blowing from the north or south. Normally it is approximately three feet deep; the bottom consisting of very "soupy" mud. When the wind is blowing from the north there is very little water, and in some periods nowater at all. When there is a strong wind from the south the depth approaches four or four and one half feet. The lake is fed by small streams from the north but the water is brackish at times. There is testimony to the effect that it has increased in size over a period of years and especially after hurricanes which have occurred in the area.
Round Lake is presently connected to Palmetto Bayou and Bay Rambo through Lasseigne Cut and Lasseigne Lane. Testimony of numerous older inhabitants of the area establish that prior to a period in the early 1900's, Round Lake had no connections with other bodies of water but due to certain trenasses or cuts made by certain individuals in the area, it shares its present connections with the bodies hereinafter set out. Relative recent oil operations in the area have resulted in a system of deep navigable canals being constructed. Due to these man-made canals in the area, it is now possible to reach the Gulf from the Round Lake area.
As to navigability of Round Lake in 1812, there is very little concrete evidence to establish or disestablish navigability. All maps of the area prior to 1905 filed in the record do not indicate any body of water in the Round Lake area. The Harrisons' expert witnesses felt that Round Lake was non-existent in 1812. Conversely, the State's expert witness was of the opinion that Round Lake is navigable at the present time; that there had been very little change in Round Lake since 1932; thencefore, *729 his opinion was that it was navigable in 1812. Since it is incumbent upon the State to prove that the waters in dispute were navigable in 1812, we feel that the State has failed to discharge this burden and we are convinced from the record as a whole that the waters in dispute were not navigable in 1812.
As to present navigability, many residents of the area were called upon to testify. It would serve no useful purpose to undertake a minute discussion of the testimony of all the witnesses who testified in the matter. Our evaluation of the testimony on the various witnesses coincide with that of the trial judge who stated:
"There are some living people who do shed light. Joseph O. Schwartz testified. He is an educated, retired lawyer and a Captain of the United States Naval Reserve. He had no particular qualifications that impressed this Court as to his ability to take measurements and depth of waters other than the fact that he was an intelligent man. By going back and forth across Round Lake in a boat that only drew six inches of water, and by using an ordinary garden rake because Round Lake was `soupy', he found that the deepest part was three feet. As far as he could determine, the tide in the lake was controlled primarily, but not completely, by the wind.
"Mrs. Webb Danos, who has trapped this area for many years, could not traverse Round Lake in a fourteen by three foot boat without push-poling it through the mud.
"Mrs. Duroc Cheramie testified to the same effect as did Mrs. Webb Danos.
"Cheramie Duet (deposition taken March 26, 1958, appearing in Vol. 1, at Tr. p. 204) states that in 1902, Round Lake and Palmetto Bayou were separated by about one hundred fifty (150) feet of land. At that time, there was only a very small two and a half (2½) foot cut known as Lasseigne Cut, which was twelve (12) to eighteen (18) inches deep connecting the two bodies of water. In 1902, he states that to reach Round Lake it was necessary to drag a pirogue over the marsh lands because at that time Round Lake was only a duck pond.
"John Pitre testified. Walter J. Harrison testified. William H. Harrison testified. From their testimony, we gather a deep impression that the only way to get in and out of this area was by small boat, and even then by dragging the small boat across certain marshes or land to continue one's journey.
"Donatien Hebert (deposition of June 24, 1958, in Vol. 4 of this record) states that he was well acquainted with this area back in 1912 because he trapped it. He remembers Lasseigne Cut. At that time, it was about one hundred (100) feet long because the two bodies of water were becoming more closely connected. At that time, Lasseigne Cut was from eighteen (18) to twenty (20) inches in depth and all mud. He also refers to Round Lake in 1912 as being a duck pond. He states that before the oil company cut canals, he could make it through in a small boat drawing no more than eight (8) inches of water. He further states that he has seen Round Lake without any water in it for days at a time and has had to slide or push his pirogue over the mud bottom of the lake; that there is no possibility of going into Round Lake in the winter time, except by using the oil company canals.
"George Mannich visited the disputed area on October 15, 1885, and remembers the names of Victor Rigaul and Mandeville Marques with whom he went there * * *. Mr. Mannich testified that at that time Round Lake was completely closed and there was *730 from five to six hundred feet of land between Round Lake and Palmetto Bayou with no connection; that Round Lake was very shallow and it had only fresh water with duck grass; that it was used by duck hunters who reached it by push-poling their boats. He states that he went there every year up to 1892, at which time he lost his boat and did not return, except that he saw it in 1916 * * *, at which time it was slightly wider; that there were some changes made in the storm of 1915 * * *
"Ludovic Boudreaux, Duard Martin and Paul Borne were three State witnesses. Generally speaking, these three witnesses stated that they had fished in Round Lake; that they had trawled in Round Lake; that before the oil companies dredged artificial canals, Round Lake and Bay Rambo were not connected; that they did not know whether Bay Rousseau and Palmetto Bayou were connected; and, in passing, two of these witnesses sold their seafood to Ludovic Boudreaux. Because of close association, we believe that what Ludovic Boudreaux remembered would be recalled by the other two.
"Rudolph Cheramie testified. He stated that he first went to Round Lake with his father in 1897 to hunt alligators, that at that time Round Lake and Palmetto Bayou were separated by two arpents of land; that Round Lake had two small coulees that pinched out or faded into the marshes; that Round Lake had to be reached by dragging pirogues over the marshes. Mr. Cheramie testified that some time before 1909 Francois Lasseigne and Adam Dardar cut a small trenasse between Round Lake and Palmetto Bayou about forty inches wide by fifteen inches in depth; that after the 1909 storm, this small trenasse or cut was opened up and then a three or four foot wide boat with an outboard motor could pass through it. He stated that in 1897 it was impossible to go from Bay Rambo to Palmetto Bayou by boat. Mr. Cheramie testified that the water was fresh and that Round Lake is quite shallow.
"All of the evidence in this case convinces us that as a matter of fact, up until almost 1900 these bodies of water were rather locked, fresh water lakes and streams; that later on, venturesome hunters and trappers dug small canals and trenasses, which, in turn, were enlarged by storms until eventually passage was possible through this area, except in winter, and then water was high, by the use of small shallow draft boats. This description of the area does not place these waters as navigable as we understand the term. Certainly there never was any commerce in any of this area other than the seeking out and transportation of wild life by hunters and trappers, who went into these privately owned properties with the permission of the owners. Even as to this restricted commercial traveling through this area, it was not public travel, but travel on private property by employees, licensees, or parties contracting with the owners. Whether considered from a viewpoint of physical navigation or described from the viewpoint purely and simply as the word `navigable' is legally interpreted, we must and have come to the conclusion that the disputed area never did not does it now contain any navigable waters. In making this remark, we exclude the man-made canals that now exist through this area. Oil companies have made such canals with the permission and approval of the land owners. Obviously, these man-made canals are navigable in fact for that is the reason they were dug. They are not navigable in the legal sense of the word and the digging of these canals has not given the State any claims to their bottoms."
*731 Having reached the conclusion that Round Lake and the area to the north is not presently navigable, nor was it navigable in 1812, it is unnecessary for this decision to pursue the matter further. However, due to the importance of the issues involved, the remaining contention of the State will be considered.
In view of the holding of the majority in the case of California Co. v. Price et al., 225 La. 706, 74 So.2d 1, it is immaterial whether the bottoms in question be navigable or non-navigable waters if validly patented prior to the Constitutional prohibition of 1921 and no legal action has been filed within the time as set forth in Act 62 of 1912, however, we thought it important to determine the question as to navigability, for if not navigable under the jurisprudence there would be no question of susceptibility of private ownership as was one of the main issues in the Price case.

The Miami Case, Price Case and Act 62 of 1912 (LSA-R.S. 9:5661)
When Louisiana was admitted to the Union in 1812 it acquired the beds of all navigable streams and Lakes by virtue of its inherent sovereignty. See, e. g. State v. Bayou Johnson Oyster Co., 1912, 130 La. 604, 58 So. 405; State v. Richardson, 1916, 140 La. 329, 72 So. 984; Board of Commissioners for Buras Levee Dist. v. Mt. Forest Fur Farms, 178 La. 696, 152 So. 497; State v. Aucoin, 1944, 206 La. 787, 20 So.2d 136.
Prior to Article IV, Section 2 of the Constitution of 1921, LSA, there was no Constitutional prohibition against the State alienating the beds of navigable bodies. However, the LSA-Civil Code provides:
Article 453. "Public things are those, the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation: of this kind are navigable rivers, seaports, roadsteads and harbors, highways and the beds of rivers, as long as the same are covered with water.
"Hence it follows that every man has a right freely to fish in the rivers, ports, roadsteads, and harbors."
Article 455. "The use of the banks of navigable rivers or streams is public; accordingly every one has a right freely to bring his vessels to land there, to make fast the same to the trees which are there planted, to unload his vessels, to deposit his goods, to dry his nets, and the like.
"Nevertheless the ownership of the river banks belongs to those who possess the adjacent lands."
Article 509. "The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion.
"The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or stream, and whether the same be navigable or not, who is bound to leave public that portion of the bank which is required by law for the public use."
Article 510. "The same rule applies to derelictions formed by running water retiring imperceptibly from one of its shores and encroaching on the other; the owner of the land, adjoining the shore which is left dry, has a right to the dereliction, nor can the owner of the opposite shore, claim the land which he has lost.
"This right does not take place in case of derelictions of the sea."
In the case of Miami Corporation v. State, 1936, 186 La. 784, 173 So. 315, the Supreme Court held that when a parcel of land (under a valid state patent) adjoined a navigable body of water (the bed of which had never been patented to an individual or concern), and where the forces *732 of nature-subsidence and erosion caused a part of the land to become part of the bed of the navigable body, then such submerged area becomes a portion of the navigable body of water owned by the State and is lost to the landowner.
In 1912 the State Legislature passed Act 62 (LSA-R.S. 9:5661) which provides that the State shall have six years from the date of issuance of a patent, or six years from the passage of Act 62 of 1912 within which to sue to have the said patent set aside.
Interpreting Act 62 of 1912, the Supreme Court has held that when the State has issued a patent to an individual or concern on the bed of a navigable body of water and has failed to sue to have the patent set aside within the time prescribed, the title is confirmed and becomes unassailable. (State v. Sweet Lake Land & Oil Co. et al., 1927, 164 La. 240, 113 So. 833; Realty Operators, Inc. v. State Mineral Board, 1942, 202 La. 398, 12 So.2d 198; O'Brien v. State Mineral Board, 1946, 209 La. 266, 24 So.2d 470; Humble Oil & Refining Co. v. State Mineral Board et al., 1953, 223 La. 47, 64 So.2d 839; California Company v. Price et al., 1954, 225 La. 706, 74 So.2d 1.
The Price case, supra, reviews the prior jurisprudence and the majority opinion held that patents issued to individuals on the bed of Grand Lake, a navigable body of water, (admittedly navigable in 1812 and at the present time) were valid and unassailable in view of Act 62 of 1912.[1]
In view of the above it appears that the law is that if a body of water is navigable and has never been validly patented to an individual, the bed belongs to the State by virtue of its inherent sovereignty. If the body of water is navigable and has been patented to an individual or concern, and the patent has not been assailed in pursuance to Act 62 of 1912, the bed belongs to the present record title holder of the land provided the patent issued prior to the Constitution of 1921. However, if an individual owns land under a valid patent and said land is connected to a navigable body of water (the said body of water not validly patented to an individual) then any inundation of the land by the body of water results in the State acquiring that which becomes part of the bed of the navigable body of water.

The State's Plea of Estoppel
Counsel for the State included in their answer a special plea of estoppel based on the allegation that Joseph deFuentes Harrison (father of the present Harrisons) assumed a position different from the one in the case at bar in the suit of Harrison v. Grandison Company, Civil Action No. 292, United States District Court, Eastern District of Louisiana, New Orleans Division, 51 F.Supp. 768. This was a jactitory action brought by Harrison in the State Court, but removed to the Federal Court and converted into a petitory action by defendant, Grandison Company. The State contends that counsel for Harrison took the position in oral argument in the Federal case that some of the water bodies contested in the present suit were navigable.
It is settled jurisprudence that there are three elements of estoppel, namely: (1) representation, (2) reliance, and (3) change of position to one's detriment. Suffice it to say that we cannot see how the State could have relied on any representation of counsel for Mr. Harrison, the ancestor in title of the present Harrison, and how the State could have changed its position to its detriment. Further it appears that the contention of Mr. Harrison in Federal Court was unsuccessful and it is established jurisprudence that a fact unsuccessfully *733 pleaded may never be used as a basis of judicial estoppel. Harnischfeger Sales Corp. v. Sternberg Co., Inc., 1934, 180 La. 1059, 158 So. 556; Smith v. Phillips, 1932, 175 La. 198, 143 So. 47.
Counsel for the State further contends that if the theory of judicial estoppel be rejected, that the entire record in the Harrison v. Grandison case should have been admitted. The lower court refused to allow these records to be admitted and we think correctly so. Clearly, testimony from the prior case, not used for impeachment purposes, is hearsay evidence. However, there are some instances when such testimony is admitted which are not necessary to consider now. Identity of issues and the full opportunity of cross-examination, requisites for the admission of prior records, are clearly lacking in the instant case.
For the reasons hereinabove assigned, the judgment of the lower court is affirmed.
Affirmed.
NOTES
[1] We are not unmindful of the fact that the Price case was decided by a divided court and regardless of the individual belief of the members of this Court as to the correctness of the majority or minority dissenting opinions, we are following the majority opinion as we feel legally bound to do.