O’NIELL, C. J.
 

 This is a petitory action in which the state claims title to the bed of Sweet Lake, in Cameron parish. The area is approximately 1,800 acres, the lake being 3 miles long and a mile and three-tenths wide. It has an average depth of 4 feet, and is situated about 15 miles from the gulf coast, partly in T. 12 S., R. 7 W., and partly in T. 13 S., R. 7 and 8 W. It has no natural inlet or outlet, and is embraced within a tract of land containing 58,000 acres claimed and possessed by the defendant Sweet Lake Land & Oil Company.
 

 The company holds title under three state patents, describing by numbers and subdivisions of sections and purporting to convey the tract of 58,000 acres, including the area covered by the lake, and composed of 14,-080 acres in T. 12 S., R. 7 W., 22,080 acres in T. 13 S., R. 7 W., and 21,840 acres in T. 13 S., R. 8 W. The lake is not mentioned in the patents, of course, but the submerged area is included in the area described by the numbers and subdivisions of the sections sold and paid for.
 

 The three patents for the .tract of 58,000 acres, being patents No. 5148, No. 5149, and No. 5160, were issued to J. B. Watkins on the 24th of May, 1883, under the provisions of section 11 of Act 75 of 1880, p. 87, authorizing the register of the state land office to sell, at 12% cents per acre, “the public lands donated by Congress to the state of Louisiana, designated as sea marsh or prairie, subject to tidal overflow.” The patents were duly recorded in the state land office and in the conveyance records of Cameron parish.
 

 Watkins sold the 58,000 acres to the North American Land & Timber Company, on the 12th of December, 1888; the North American Land & Timber Company sold to the North American Land Company on the 2d of February, 1920; and the North American Land Company sold to the defendant Sweet Lake Land & Oil Company on the 26th of February, 1923. All of the transfers were by warranty deeds and were duly recorded.
 

 The Pure Oil Company, the other defendant in the suit, holds an oil and gas lease on the 58,000 acres, from the eodefendant, Sweet Lake Land
 
 & Oil
 
 Company, dated the 19th of November, 1924, and, subsequent to that date, had spent more than $100,000 in drilling for oil and gas, in the bed of Sweet Lake, and was carrying on its drilling operations when the Attorney General filed this suit.
 

 During a period commencing nearly 30 years before the suit was filed, extensive reclamation and farming operations were carried on by the North American Land & Timber Company and continued by its successor in title, the North American Land Company, on a large part of the tract of 58,000 acres surrounding the submerged area called Sweet Lake.
 

 The defendant Sweet Lake Land & Oil Company and its predecessors in title, commencing with J. B. Watkins, paid promptly, each year, the state and local taxes for which the whole 58,000 acres of land was assessed annually, during the period exceed
 
 *245
 
 ing 30 years before tbe suit was filed. The defendants and their predecessors in title therefore had civil possession of the land for more than 30 years and had actual, physical possession for nearly 30 years before the state disputed their title to the submerged area of the lake.
 

 After the suit was filed, the state entered into an agreement with the Pure Oil Company to lease the bed of the lake to the company for the production of oil and gas, if the state should win the suit. It was said in the agreement that it was for the mutual advantage of the state and the Pure Oil Company that the latter should not discontinue its drilling operations on the lake.
 

 The state’s suit is founded upon the contention that the three patents that were issued to Watkins were null — not merely voidable, but absolutely void — as far as they purported to convey title for the submerged area called Sweet Lake. The cause of nullity alleged was, first, that Sweet Lake was a navigable body of water in 1812, when Louisiana was admitted into the Union, and that the bed of the lake therefore became the property of the state in her sovereign capacity and was not subject to sale or to private ownership; and, in the alternative, that, if the lake was not navigable, the submerged area was acquired by the state under the Swamp Land Grants of March 2, 1849 (9 Stat. 352, e. 87), and September 28, 1850 (9 Stat. 519, c. 84; U. S. Comp. St. §§ 4958^960); and that, according to the provisions of the Act 247 of 1855 (now section 2929 of Rev. Stat. of 1870), the beds of shallow lakes, not navigable, were not subject to sale except after having the area ascertained by a survey recognized by the state and at a price not less than $1,25 per acre.
 

 On the facts and pleadings which we have stated, the Sweet Lake Land & Oil Company set up the following defenses, viz.:
 

 (1)That Sweet Lake was not a navigable body of water — if, in fact, it was in existence — in 1812, when Louisiana was admitted into the Union, and has never been navigable either in fact or as the word is defined by law.
 

 (2) That the provisions of the Act 247 of 1855 for the sale of shallow and nonnavigable lakes, after being surveyed, and at a price not less than $1.25 per acre, were repealed or superseded by the provisions of the Act 75 of 1880, under which the whole of the 58,000 acres of land was sold to J. B. Watkins at 12
 
 y2
 
 cents per acre; and that, if the provisions of the act of 1855 were not repealed or superseded by the act of 1880, the provisions of the act of 1855 were not applicable to the character of land described in Watkins’ patents, and that a separate survey or segregation of the submerged area called Sweet Lake was not at all necessary in a sale of all of the 58,000 acres of land to one individual and at one time.
 

 (3) That the state had no right to assail collaterally, in an action at law, the title held by an innocent transferee, under mesne conveyances from the original patentee— the patents themselves being the official and conclusive declarations by the proper officers of the state that all of the legal requirements preliminary- to the issuing of the patents were complied with.
 

 (4) That the state was estopped to question the validity of the defendant’s title — es-topped not only by the solemn declarations made in the state’s patents for the land, but also by assessing and collecting taxes annually on the land, as private property, for many years.
 

 (5) That the action was barred by the prescription or limitation of six years, under the Act 62 of 1912, p. 73, by which act the Legislature ratified and confirmed, after 6 years, all patents issued by the state, and declared that the state should not have a right of action to annul, after 6 years, any patent
 
 *247
 
 issued by the state, signed by the Governor of the state and by the register of the state land office and recorded in the state 'land office.
 

 The district court gave judgment in favor of the defendants, sustaining the plea that the state had no right of action, and sustaining the plea of estoppel and the plea of prescription of 6 years under the Act 62 of 1912, and rejecting the state’s demand. The state has appealed from the decision.
 

 We agree with the district judge that there is no proof nor reason to believe that Sweet Lake was a navigable bódy of water in 1812, when Louisiana- was admitted into the Union. The lake was never useful or available for navigation or commerce, or of any more importance to the public at any time in the memory of man than it is to-day. The only people who ever saw the lake or knew of its existence before the North American Land & Timber Company undertook the reclamation and farming project on the land were the few natives who hunted and fished on the lake. The oldest of them who testified in the case had known of the lake since 1861 or 1862, and it was then what it is now, an isolated body of rain water in the midst of a dense sea marsh, without a natural inlet or outlet large enough for a pirogue to navigate. The lake was not shown on any map of that region until 1866, and had no name until 1885, when a party interested in the reclamation work of the North American Land & Timber Company, and looking for a body of fresh' water to irrigate a rice farm, named the lake “Sweet Lake.” The engineers engaged in the reclamation project estimated that the submerged area could be profitably drained by pumps and put under cultivation, but they concluded that it would be better to reserve the lake as a reservoir for irrigating rice- farms on the adjoining lands. The reclamation project, however, was not a great success, considering the enormous expenditure made in machinery and labor. The North American Land & Timber Company cut a canal to the-lake, but before that was done the lake was never navigated by any craft except now and then by a pirogue which some alligator hunter or fisherman dragged across the sea marsh. The Intercostal Canal, which was-cut through that region a few years ago by the United States government, does not connect with the lake, but passes at a distance-about 200 yards south of it. Aside from the isolated situation of the lake — so remote-from civilization — it must be remembered, that it is entirely within the land of only one. owner. It was never destined to be a public-highway for commerce or navigation.
 

 The rule laid down by the Supreme Court of the United States is that streams and lakes which are navigable in fact are deemed navigable in law, and that they are-navigable in fact when they are used or are susceptible of being used in their natural and ordinary condition as highways for commerce, over which trade and travel are- or may be conducted in the customary modes, of trade and travel on water. The Daniel Ball v. United States, 10 Wall. (77 U. S.) 557, 566, 19 L. Ed. 999; United States v. The Montello, 20 Wall. (87 U. S.) 430-445, 22 L. Ed. 391; United States v. Cress, 243. U. S. 316, 323, 37 S. Ct. 380, 61 L. Ed. 746; Economy Light & Power Co. v. United States, 256 U. S. 113, 121, 41 S. Ct. 409, 65 L. Ed. 847; Oklahoma v. Texas, 258 U. S. 574, 586, 42 S. Ct. 406, 66 L. Ed. 771; Brewer-Elliott Oil & Gas Co. v. United States, 260 U. S. 77, 43 S. Ct. 60, 67 L. Ed. 140. The-same rule with regard to navigable waters of the state, as contradistinguished from the-navigable waters of the United States, has-been observed in the decisions of this court. Goodwill v. Police Jury of Bossier Parish, 38 La. Ann. 752; Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249; Board of
 
 *249
 
 Commissioners of Caddo Levee District v. Glassell, 120 La. 400, 45 So. 370; Delta Duck Club v. Barrios, 135 La. 357, 65 So. 489; Smith v. Dixie Oil Co., 156 La. 691, 101 So. 24.
 

 In a supplemental brief, the state urges, for the first time in this case, that, even though Sweet Lake may not have been a navigable lake when Louisiana was admitted into the Union, the submerged area which is now the bed of the lake — and in fact all of the vast area of sea marsh surrounding it— were “lands within the tidewaters of the sea,” and therefore became the property of the state in her sovereign capacity, and were not subject to sale or private ownership. The contention on behalf of the state is that lands described as “sea marsh, subject to tidal overflow,” were not included in the donations to the state by the Swamp Land Grants of March 2, 1849 (9 Stat. 352, c. 87), and September 28, 1850 (9 Stat. 519, c. 84; U. S. Comp. St. §§ 495S-4960). There is no merit in the contention. The Legislature, in providing for the sale of the vast areas of land, described “as sea marsh, subject to tidal overflow,” acknowledged that such lands were included in the donations by the Congress of the United States, by the swamp land grants of 1849 and 1850, in which grants the lands donated were described as “the swamp and overflowed lands.” The eleventh section of the Act 75 of 1880, p. 87, under authority of which the three patents in contest were issued to J. B. Watkins, declares:
 

 “That the public lands donated by Congress to the state of Louisiana, designated as sea marsh or prairie, subject to tidal overflow, so as to render them unfit for settlement and cultivation, shall be subject to entry and sale at the rate of twelve and a half cents per acre; provided, that satisfactory proof of said fact be filed with the register of the state land office.”
 

 In Morgan v. Nagodish, 40 La. Ann. 246, 3 So. 636, it was contended that the plaintiff’s marsh land — situated very much like the sea marsh belonging to the defendant in this suit — was a part of the “seashore,” defined in article 451 of the Civil Code as “that space of land, over which the waters of the sea spread in the highest water, during the winter season.” The ruling was that the plaintiff’s sea marsh was not seashore; viz.:
 

 “If the salt water, ascertained to be in a bayou, lake, cove, or inlet adjacent to or connected with an arm of the Gulf of Mexico, does not result from an overflow that is occasioned by high tides flooding its banks, but in the first instance enters an arm of the gulf and thence into said bayou, lake, etc., and is there combined with fresh water derived from other sources, same cannot be considered as an arm of the sea, nor its banks the seashore.
 

 “All that tract of land over which the greatest water flood extends itself is the seashore.
 

 “ ‘High seas’ mean that portion of the sea which washes the open coast, and do not include the combined salt and fresh waters which, at high tide, flood the banks of an adjacent bay. bayou, or lake” (citing Waring et al. v. Clarke, 5 How. 453, 12 L. Ed. 226).
 

 See, also, Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249, and Buras v. Salinovich, 154 La. 495, 97 So. 748.
 

 Having found that all of the 58,000 acres of land described in the three patents that were issued to J. B. Watkins, including the submerged area called Sweet Lake, was acquired by the state by the Swamp Land Grant of March 2, 1849 (9 Stat. 352, c. 87), we come to the state’s alternative proposition; that is, that the patents are null, as far as they purport to convey the bed of the lake, first, because the area of the lake was not first ascertained by a survey recognized by the state, as required by the Act 247 of 1855 (Bev. Stat. § 2929); and, second, because the land was sold at a price less than $1.25 per acre, as,forbidden by the act of 1855.
 

 Act 247 of 1855, p. 306, was entitled “An act to provide for the sale of one million acres of the swamp and overflowed lands.” It authorized the register of the land office
 
 *251
 
 to sell, for not less than $1.25 per acre, warrants for 1,000,000 acres of land, to be located on any of the many millions of acres of swamp or overflowed lands donated by the swamp land grants of March 2,1849, and September 28, 1850; each warrant to be issued for not more than 640 nor less than 40 acres. The act contained the declaration that any shallow lakes which had become the property of the state, and which were susceptible of being reclaimed, in whole or in part, and which were not navigable, and the area of which had been ascertained by a survey recognized by the state, might also be sold under the provisions of the act. As re-enacted in section 2929 of the Revised Statutes, the law was as follows until the Act 75 of 1880 was adopted, viz.;
 

 “Sec. 2929. Land warrants for one million acres of the swamp and overflowed lands, authorized to be issued and sold by the first.section of the act entitled ‘An act to provide for the sale of one million acres of the swamp and -overflowed lands,’ approved March 15, 1855, so far as they have already been issued, shall be located on the swamp or overflowed lands donated by acts of Congress of second March, 1849, and twenty-eighth September, 1850; the warrants to be issued for not more than six-hundred and forty, nor less than forty acres, according to the laws regulating the surveys and legal subdivision of sections adopted by the United States.
 

 “Any shallow lakes which have become the property of the state, and are susceptible of being reclaimed wholly or in part, and not navigable, the area of which has been ascertained by survey recognized by the state, may also be sold under the provisions of this section. No lands shall be sold for less than one dollar and twenty-five cents per acre.”
 

 According to the act of 1855, none of the swamp or overflowed lands that were acquired by the state under the swamp land grants of 1849 and 1850 could be sold for less than $1.25 per acre. The restriction was not confined to the beds of shallow lakes. Beyond all doubt, the statute, as retained in section 2929 of the Revised Statutes, was superseded and repealed by the Act 75 of 1880, except as to warrants already issued and sold under the provisions of the act of 1855; for the act of 1880 covered- the whole subject-matter of disposing the' swamp and overflowed lands acquired by the state under the swamp land grants of 1849 and 1850, and fixed the price at which each character of land should be sold. There is therefore no substantial basis for the argument that the patents which were issued to J. B. Watkins in 1883 should have been issued at the price fixed by, and according to the provisions of, the Act 247 of 1855, instead of being issued at the price fixed by, and according to the provisions of, the Act 75 of 1880. It is true that the beds of shallow and nonnavigable lakes were subject to location and entry under the warrants or scrip authorized by the act of 1855, and perhaps such submerged areas which were not already located on and entered under such warrants remained subject to location and entry under such warrants after the adoption of the Act 75 of 1880; but, surely, such submerged areas in the marsh lands subject to a tidal overflow, not already entered under warrants issued persuant to the act of 1855, became subject to entry at 12% cents per acre, under the provisions of section 11 of the Act 75 of 1880. As this court said, in McDade v. Bossier Levee Board, 109 La. 633, 33 So. 628, 631, speaking of a shallow lake having an area of 1,000 acres, and of the shallow and non-navigable lakes generally:
 

 “Has the word ‘overflowed’ any other meaning than ‘water covered?’ Water covered areas are not to be taken out of the operation of the grant by so simple a process as calling them lakes. The land in controversy was not a lake except in the sense in which the permanently water covered parts of all swamps are lakes.”
 

 And so, we say, the land in controversy in this case is a lake only in the sense that all such permanently water covered or submerged areas in the sea marsh, subject to tidal overflow, are lakes. As the permanently
 
 *253
 
 submerged area in controversy, like tbe sea marsh surrounding it, was subject to sale at 12% cents per acre, under section 11 of the .Act 75 of 1880, there was no reason why the acreage in the submerged area, or lake, should have been ascertained by a survey before the patents were issued. On that subject we quote again from McDade v. Bossier Levee Board, supra, viz.:
 

 “The state having selected the land in controversy as swamp and overflowed land passing to her from the general government under the Swamp Land Grants of 1849 (9 Stat. 352, c. 87) and 1850 (9 Stat. 519, c. 84), and the land department of the general government having approved the selection, and the state having granted and conveyed the said- land to the defendant board, the title to said land is held to be vested in the defendant board.
 

 “Because in the survey of the township the section lines were not run across the traverse of a water covered area, or so-called lake, of irregular shape, lying diagonally across the township, and cutting off the corner of some sections, and passing through the body of others, but not covering any single section in its entirety, and because this water covered area was not surveyed, nor its acreage computed, is no reason why such survey was not sufficient to serve as a basis for selection by the state, and approval by the general government, of the swamp and overflowed land within the township, under the swamp land grants of 1849 and 1850. Such survey established the section corners, and located the sections, and identified the land, and determined its swamp and overflowed character, and nothing more was needed for the purposes of the grants in question.”
 

 It is hardly necessary to consider the defendant’s plea that the state had no right to assail collaterally, in a petitory action against an innocent transferee holding title from the patentee, the original patents, which are apparently valid. There seems to be no doubt about the proposition that a land patent, if not void .on its face, is not only a conveyance of the title for the land, but is in the nature of an official declaration by that department of the government in which the sale of the public lands is intrusted by law that all of the requirements preliminary to the issue of the patent' were complied with, and that declaration, or pre-. sumption, is not open to rebuttal in an action-at law against an innocent transferee of the' title from the patentee. United States v. Reading, 18 How. (59 U. S.) 1, 16, 15 L. Ed. 291; Stone v. United States, 2 Wall. (69 U. S.) 525, 528, 17 L. Ed. 765; St. Louis Smelting & Refining Co. v. Kemp. 104 U. S. 635, 26 L. Ed. 875; Davis v. Weibbold, 139 U. S. 507, 11 S. Ct. 628, 35 L. Ed. 238. See, also, Lott v. Prudhomme, 3 Rob. 293; Carter v. Monetti, 6 Rob. 82; Scuddy v. Shaffer, 10 La. Ann. 133; Smith v. Crandell, 118 La. 1052, 43 So. 699; Leonard v. Garrett, 128 La. 535, 54 So. 984.
 

 Conceding, for sake of argument, that the submerged area in contest should have been separately surveyed, and that the- acreage thereby ascertained should have been sold at a rate not less than $1.25 per acre, under the provisions of the Act 247 of 1855 (section 2929, Rev. Stat.), and conceding, for sake of argument, that the title of the defendant, an innocent transferee, was subject to attack collaterally, for that cause, in a petitory action, the action is barred by the prescription or limitation of 6 years, by the Act 62 of 1912, p. 73, which provides:
 

 “That all suits or proceedings of the state of Louisiana, * * * to vacate and annul any patent issued by the state of Louisiana, duly signed by the Governor of the state and the register of the state land office, and of record in the state land office, * * * shall be brought only within six years of the issuance of patent, provided, that suits to annul patents previously issued shall be brought within six years from the passage of this act.”. Section 1.
 

 This suit was brought on the 7th of November, 1925, more than 13 years after the passage of the act. The patents were duly signed by the Governor of the state and by the register of the state land office, and were of record in the state land office when the act of 1912 was passed.
 

 
 *255
 
 “Conceding that the Governor of the state and the register of the land office were without authority to issue the patents, the Legislature had authority to ratify and confirm their acts, as was done by the statute of repose. As was said of a similar statute of limitations enacted by the Congress of the United States, in United States v. Chandler-Dunbar Water Power Co., 209 U. S. 447, 28 S. Ct. 579, 52 L. Ed. 881:
 

 “ 'The statute presupposes an instrument that might be declared void. When it refers to “any patent heretofore issued,” it describes -the purport and source of the document, not its legal effect. If the act were -confined to valid patents it would be almost or quite without use.’ ” Atchafalaya Land Co. v. F. B. Williams Cypress Co., 146 La. 1047, 84 So. 351, 258 U. S. 190, 42 S. Ct. 284, 66 L. Ed. 559. See also, Atchafalaya Land Co. v. Dibert, Stark & Brown Cypress Co., 157 La. 689, 102 So. 871.
 

 It‘is argued on behalf of the state that the Act 62 of 1912 was intended to ratify and confirm only patents voidable for in-formalities or irregularities but not absolutely null,, and that the patents which were issued to J. B. Watkins, as far as they purported to convey title for the bed of Sweet Lake, were null ab initio. Conceding, for sake of argument, that the bed of Sweet Lake was not subject to sale under the provisions •of section 11 of Act 75 of 1880, as sea marsh, subject to tidal overflow, at 12% cents per acre, nevertheless the patents were signed by the Governor and by the register of the state land office, and were recorded in the state land office, and purported to convey an area of land described so as to embrace the bed of the lake, and that is all that the act of the Legislature required in its declaration that such patents should be deemed valid and unassailable after 6 years. The patents were valid on their face, as far as the description of the land might embrace any submerged area that might be deemed a shallow nonnavigable lake. The land department had authority to sell, at 12% cents per acre, under the provisions of section 11 of Act 75 of 1880, submerged areas, provided they were not navigable streams or lakes. It was therefore within the jurisdiction of ‘the land department, primarily, to determine whether any such submerged area was a navigable or non-navigable lake.
 

 It is argued on behalf of the state that the rulings in Atchafalaya Land Co. v. F. B. Williams Cypress Co., supra, and Atchafalaya Land Co. v. Dibert, Stark & Brown Cypress Co., supra, are not pertinent because the state was not the plaintiff in either of those eases. The statute of 1912, in the same terms in which it bars an action by “private corporations, partnerships, or persons,” bars an action by the state herself, after 6 years, and, as the statute is the solemn declaration of the state, there is no reason why it should not be as effective against her as against all others. In Atchafalaya Land Co. v. F. B. Williams Cypress Co., it was contended that the prescription could not run against the state because of the prohibition in article 193 (now section 16 of article 19) of the Constitution, against prescription running against the state in any civil matter, but we called attention to the fact that the constitutional prohibition was qualified thus, “unless otherwise provided in this Constitution or expressly by law.” It is otherwise provided expressly by the Act 62 of 1912.
 

 The judgment is affirmed.