285 So.2d 845 (1973)
SINCLAIR OIL & GAS COMPANY
v.
DELACROIX CORPORATION et al. (two cases).
Nos. 5251, 5252.
Court of Appeal of Louisiana, Fourth Circuit.
November 16, 1973.
*846 William J. Guste, Jr., Atty. Gen., of La., Edward M. Carmouche, Asst. Atty. Gen., Charles Romano, Sp. Asst. Atty. Gen., for appellant, State Mineral Board.
Charles H. Livaudais, Chalmette, for defendant-appellees.
Hugh M. Wilkinson, Jr., New Orleans, for Delacroix Corp., Alice Aby, and others, Royalty Owners, Adam Gonzales, Carroll C. Quatroy and Hazel M. Quatroy.
James Wilkinson, III, New Orleans, for C. Henry Adams, Jr., and others, Royalty Owners.
Melvyn Perez, Chalmette, for Louis Carmadelle and Gustave W. Carmadelle, Joseph Menesses and Ernest Melerine.
F. Rivers Lelong, New Orleans, for Frank A. Ashby, Jr., Frank R. Bailey, C. T. Cardin and James E. Grady.
*847 Emile E. Martin, III, Belle Chasse, for Boyd & Company, and others.
Sidney C. Schoenberger, New Orleans, for Pubco Petroleum Corp.
Darryl W. Bubrig, Sr., Buras, for Jean Mason Bowles.
Thomas M. McBride, III, Chalmette, for Omeadow Robin, Eva R. Mones, Herman Robin and Eleanor Robin.
Before REDMANN, STOULIG and BOUTALL, JJ.
BOUTALL, Judge.
The State Mineral Board appeals from two judgments in consolidated cases, which recognized the private ownership claims to minerals production royalties from certain unitized acreage, including water bottoms, and rejected claims of the State of Louisiana to production royalties allocable to the water bottoms.
The consolidated concursus proceedings were separately filed, one for Sand Unit A and one for Sand Unit B, by petitioner Sinclair Oil & Gas Company following completion of two gas distillate wells in an isolated marshland area of Plaquemines Parish lying some two miles south of Lake Lery, something over a mile west of a waterway called Bayou Gentilly and something over a mile north and northwest of Grand Lake.
Because the wells were found to be producing from reservoirs including multiple ownership the Louisiana Conservation Commissioner had previously created permanent production units for each well. Said unit areas abut each other, each unit area actually being two production units, as each well produces from dual completions and the two producing sands were determined to be coextensive in each well.
Sinclair (now merged into Atlantic Richfield Company) holds multiple mineral leases from private owners and further holds a mineral lease from the State Mineral Board purporting to cover all State owned water bottoms in a defined area which includes the full extent of the units.
The aggregate of the said production units includes portions of Sections 5, 7, 8, 17 and 18 in Township 15 South, Range 14 East, Plaquemines Parish, Southeastern Land District of Louisiana.
All of the area in question consists of Sections certified to the United States by the State of Louisiana as sections of swamp and overflowed lands for acquisition under the Swamp Land Grants. The State of Louisiana in turn transferred the sections to the Lake Borne Basin Levee District. The Lake Borne Basin Levee District sold these and other sections to one Fernando Estopinal, and the private claimants all deraign their title and claim of ownership from Estopinal. Thus the basic issue to be decided is whether the State divested itself of its title to all, or any portion of the area in question. The Mineral Board had originally urged that the sale from the Levee District to Estopinal was fraudulent, but it has abandoned that claim. The issue is thus narrowed to whether the State effectively divested itself of the water bottoms located within the area. The Mineral Board contends that the State could not have transferred title for two reasons: (1) that the water bottoms are navigable waterways and the title must remain in the public domain, and (2) that the water bottoms are suitable for oyster cultivation, and hence certain Oyster Statutes, namely Act 153 of 1902 and Act 189 of 1910, would prohibit the transfer of title to such water bottoms.
We have been furnished several maps and plats showing the area in question and detailing the water bottoms claimed herein, but it might be well for the court to here give a brief general description of the area. The two units are approximately equal in area and abut along a straight east-west base line, or section line. The north unit is called Sand Unit B, consisting of portions of Sections 5, 7 and 8, and is roughly wedge-shaped with an area of *848 622.96 total acres, of which 233.3 acres are water bottoms. The major portion of these water bottoms consists of the southern portion of Lost Lake, and a large unnamed lagoon connected to the southeast portion of Lost Lake and connected through the north fork of Bayou Sabine to Bayou Gentilly. The unit south of the section line is Sand Unit A and consists of portions of Sections 17 and 18, is semi-elliptical in shape, and contains 623.02 total acres, of which 323.7 acres are water bottoms. The water bottoms in this unit are called the Marretta Congo, and they are connected to Bayou Gentilly through the south fork of Bayou Sabine, and there is also a connection through an unnamed bayou into Lake Petit. It should be further noted that access to the area is also had by a channel dredged along the western side of the area to provide access to drill oil wells in the general vicinity, and from which another channel was dredged to drill the particular wells in these two units. Also on the east side of the area there is a pipeline canal dredged for service of the general area. There are also two other canals which connect with waterways in the area.
It should be noted at this time that there are other water bottoms within the disputed area, some of them connected to the claimed water bottoms and others apparently with no connection, and that the State does not claim the ownership of these water bottoms. As noted above the State's claim appears to rest upon the two-fold base of navigability of the waters, and suitability for use in oyster production. We assume therefore that these uncontested water bottoms do not meet the test imposed by these two bases and hence are either nonnavigable or nonsuited for oyster cultivation.
Primarily, the private claimants insist that it makes no difference under the present law whether the water bottoms are navigable or not because the State is without right to assail the title of these claimants, being barred by the limitation of six years prescribed by Act 62 of 1912 (LSA-R.S. 9:5661). They contend the existing jurisprudence is declarative of the principle that this limitation is imposed without regard to the navigability of the waters. Nonetheless, they do strongly urge to us, and have produced evidence in support thereof, that the water bottoms are in fact nonnavigable, and always have been.
The private claimants deraign their title from a conveyance by Lake Borne Basin Levee District to Fernando Estopinal in a Notarial Act of Conveyance before James D. St. Alexander, Notary Public for St. Bernard Parish, dated December 19, 1902 and registered December 24, 1902 in Plaquemines Parish in Conveyance Book 37, Folio 67 (Delacroix Exhibit 11). That act exhibits nothing that would cause us to say it is null and void on its face. No judicial attack has been made by the State on the validity of this Act of Conveyance until the present suit. There is no question but that the time period imposed by Act 62 has long since passed insofar as the subject property is concerned. Our Supreme Court has recognized in a series of cases involving nonnavigable water bottoms that Act 62 of 1912 barred, following six years, any State proceeding to reform or vacate a conveyance by the State or a State subdivision to a private owner. We refer to Atchafalaya Land Company v. F. B. Williams Cypress Company, 146 La. 1047, 84 So. 351 (1920); State v. Sweet Lake Land & Oil Company, 164 La. 240, 113 So. 833 (1927); Realty Operators v. State Mineral Board, 202 La. 398, 12 So.2d 198 (1943); O'Brien v. State Mineral Board, 209 La. 266, 24 So.2d 470 (1946). The Supreme Court has also declared that the Act of 1912 applied to bar a State attack on a transfer to private ownership of navigable water bottoms. We refer to Humble Oil & Refining Company v. State Mineral Board, 223 La. 47, 64 So.2d 839 (1953); California Company v. Price, 225 La. 706, 74 So.2d 1 (1954).
It is suggested to us that the principles announced in these latter two cases *849 should be rejected and we are referred to the dissenting opinions in the case of Carter v. Moore, 258 La. 921, 248 So.2d 813 (1971), and our own decisions in the cases of Winkler v. State Mineral Board, 239 So.2d 484 (La.App. 4th Cir. 1970) and the case of Stevens v. State Mineral Board, 221 So.2d 645 (La.App. 4th Cir. 1969), reversed on procedural grounds 255 La. 857, 233 So.2d 542 (1970). Despite what some, at least, of the members of this court may feel the proper principle of law to be, it is not within our authority to change those principles of law announced by our Supreme Court, but we must follow them, and if change is needed, we must rely upon that superior court to effect such a change. We see no reason to discuss the issue in depth, especially since we find the waters nonnavigable, but we refer to the various dissenting opinions, and further to the opinion of our brothers of the First Circuit in the case of State v. Cenac, 132 So.2d 897 (La.App. 1st Cir. 1961). As to the cases of Stevens and Winkler, there are factual differences which distinguish these cases as will be pointed out hereinafter.
We would consider the line of cases mentioned above supporting the application of Act 62 of 1912 to be decisive of the issues in this case, but because of the factual differences in the various cases above mentioned and the present case, we deem it necessary to inquire further into the validity of the Act of Conveyance from the Levee Board to Estopinal. For a clearer understanding, we again summarize the initial links in the private claimants chain of title as follows:
"(1) * * * said sections were among those lands certified by the State to the United States as swamp and overflow lands and were approved by the United States to the State on May 6, 1852, under the Swamp Land Grant Act, 43 U. S.C.A., Sections 981-987, Acts of Congress approved March 2, 1849.
"(2) * * * said Sections were included in tracts transferred from the State to the Lake Borgne Basin Levee District by Act No. 14 of 1892, creating the Levee District.
"(3) * * * in an instrument dated April 2, 1895, and recorded in Plaquemines Parish on May 24, 1895, the Register of the State Land Office conveyed the said sections, among other acreage, to the Levee District.
"(4) * * * In an instrument dated December 19, 1902, the Levee District conveyed said sections to Fernando Estopinal, along with other property totaling approximately 64,000 acres, for the total price of $4,642.96. Estopinal, the then Secretary of the Levee Board, is the ancestor-in-title of all of the private claimants herein.
"(5) * * * in an instrument dated July 27, 1910, and recorded in Plaquemines Parish on August 13, 1910, the Auditor of Public Records conveyed the said sections, among other lands, to the Levee District."

The State contends that link 4, the Conveyance of 1902 to Estopinal, is null, but alternatively it could not be effective until August 13, 1910 when link 5, the auditor's transfer, was recorded. The State refers to Section 11 of Act 14 of 1892 which provides that it "shall be the duty of the Auditor and Registrar" to convey the lands to be granted to the Levee Board and "when said conveyances are so recorded, the title to said land, with the possession thereof, shall from thenceforth vest absolutely in said board of levee commissioners, its successors or grantees". In support thereof, the State refers us to the cases of State v. Aucoin, 206 La. 787, 20 So.2d 136 (1944), and State v. Cross Lake Shooting and Fishing Club, 123 La. 208, 48 So. 891 (1909). We have no quarrel with what seems to be the plain wording of the Statute. However, we are of the opinion that this issue is controlled by Act 316 of 1926 which provides as follows:
"Section 1. Be it enacted by the Legislature of Louisiana that all deeds of *850 transfer heretofore made by either the Auditor or Registrar of the State Land Office of this State to * * * * the Lake Borne Basin Levee District under the various Acts creating said Levee Districts, * * * * be and the same are hereby ratified, quieted and confirmed, the same as if all such deeds had been signed by both the Auditor and the Registrar of the State Land Office of this State, * * * *".
We believe the provisions of this Act to be controlling, and hold that the defect in link 3, wherein only the Register of the State Land Office conveys to the Levee District is cured by the operation of this Act. We refer to the case of Barnett v. State Mineral Board, 193 La. 1055, 192 So. 701 (1939) in which the Supreme Court stated:
"A mere reading of Act No. 316 of 1926 discloses that the act does not purport to legalize the unauthorized or invalid act of any officer, agent, or servant of the State. What the Auditor did in this case, and what he has done in numerous similar cases, was not an illegal act on his part. At most, his action merely lacked the concurrence of the Register of the State Land Office, which might otherwise be supplied. There is no reason why the Register could not have subsequently concurred in the action of the Auditor. On the other hand, the Legislature, if it saw fit, might have divested the Register of his authority to concur in the act of the Auditor and vested that authority in some other public official or employee; or the Legislature, as it did in effect by the adoption of Act No. 316 of 1926, might have done away with the necessity of another mere ministerial and formal signature to instruments executed pursuant to prior statutes.
"As we have hereinabove pointed out, Act No. 316 of 1926 was not a sale. It was not even a new grant. It was merely the ratification and confirmation of informally executed deeds of transfers from the State to its various levee districts. There is no doubt of the right of the Legislature to adopt the statute. The statute itself is not unconstitutional because its declared purpose is to cure an irregularity of non-observance of requirements which it originally might have dispensed with. The statute relates back to the execution of the original deeds of transfer to the various levee districts. Under its express terms, it ratifies, quiets, and confirms all prior transfers of lands to the levee districts, whether the transfers be signed either by the Auditor or by the Register `the same as if all such deeds had been signed by both' of those officersThat is to say, as if the deeds had been originally signed by both the Auditor and the Register."
In our opinion, this holding requires us to rule that Act No. 316 of 1926 makes the 1895 transfer by the Register effective, not in 1926 the time of passage of the Act (in which case other Statutes would be applicable), but back to the time of the transfer to the Levee Board in 1895 and thence to the acquisition from the Board by Estopinal in 1902.
Thus, we consider the pertinent laws to be those in existence in 1902 and prior thereto, not those of 1926 nor 1910, the date of link 5. With this conclusion, we also determine that the two Acts of the Legislature relied upon by the State, that is Act 189 of 1910 relating to oyster cultivation, and Act 258 of 1910, relating to water bottoms, are not applicable to the validity of the 1902 Act of conveyance, and thus we distinguish this situation from later conveyances such as occurred in the cases of Stevens and Winkler, supra.
According to the rationale of Barnett, the subsequent act of the Auditor's transfer may be disregarded as superfluous since the transfer by the Register alone is sufficient. However, since it is contended that the 1926 Act does not apply here because *851 of the eventual transfer in 1910 (link 5) by the Auditor, we say that the result is the same in either situation. That is, Act 316 of 1926 does not legalize an invalid act as stated in Barnett, supra. Thus, if there is no impediment to the later transfer by the Auditor because of intervening prohibitory legislation between 1902 and 1910 (reference Acts 189 and 258 of 1910) then the later transfer is null and void (See Winkler v. State Mineral Board, supra.).
Unfortunately the application of Act 316 of 1926 does not solve one of the basic issues presented to us, that is, was the transfer in 1895 or the conveyance of 1902 subject to nullity by virtue of laws in existence at that time or prior thereto. To answer this question we must now inquire into the facts of navigability and suitability for oyster cultivation. We shall first address ourselves to the question of navigability of the water bottoms in question.
The evidence produced consists of a number of surveys and maps and the testimony of five witnesses (One by deposition). Of these, three testified for the private claimants and two testified for the State Mineral Board. The testimony of all of the witnesses agrees on the following: That the water bottoms claimed navigable are of minimum depth, of limited natural access and traversable only by the smallest of boats. The testimony differs in the degree of these factors. Additionally, difficulties arise in assessing the evidence presented, because the basic inquiry is as to the status of the property in 1902 and its availability for conveyance to private individuals then and secondarily to a consideration of its status at the time of trial. To put it another way, if the water bottoms were not navigable prior to the transfer of title to Estopinal, there can be no legal hindrance to the transfer on that basis.
The only definitive evidence in connection with the condition of the area in 1902 was the deposition of Mr. Alcide Campo, a resident of Delacroix Island since his birth in June 18, 1889. Mr. Campo testified that he has fished all over the area within a number of miles from Delacroix Island, and was familiar with the Lost Lake and Marretta Congo areas since he was a youngster of 11 or 12 years old, accompanying his father who was also a fisherman. He testified that the only way to get into Lost Lake and Marretta Congo was to drag over the marsh in a pirogue, and that even when upon those water bottoms, the water was very shallow. He was asked about the conditions of other water bottoms, such as Grand Lake, Lake Petit, and other bays and lakes as well as the various bayous in the area. His testimony makes it very clear that he distinguished between the navigability and depth and size of these other water bottoms as compared to the two here in question. His testimony showed that the size and depth and accessibility of these water bottoms increased within his life span beginning with the hurricane of 1915 and subsequent hurricanes, which scoured the area and made the water bottoms deeper and more accessible. He further testified that since the advent of the canals dredged for oil exploration, further scouring and accessibility was obtained.
Supplementing this testimony was that of Mr. Adam B. Melerine, the former field superintendent of the Delacroix Corporation, who exhibited some knowledge of the area when he was a youngster, but whose definitive testimony begins around 1920. He similarly testified that access into the area was only by pirogue dragged across the marsh and that these areas were so shallow that it was difficult to cross them even with a pirogue. Further evidence was presented by the testimony of Mr. Aubry G. Burke, a surveyor, who surveyed the area extensively in 1952 for the dredging of a canal in order to explore for oil. He also testified that the only access into the area was by pirogue and by airboat, and that it was impossible to get any other type of craft in and through the area in order to perform the necessary work involved. In December of 1970 and January of 1971, he had occasion to take soundings *852 of the water bottoms in question for the Delacroix Corporation to determine the depths of the various water bottoms. In Marretta Congo he found the depth to range from several inches to less than three feet except where the channels were dug. He testified that in many of the areas at low tide the mud bottom is exposed. In Lost Lake the depth ranged from several inches to 4.7 feet in the deepest part.
As opposed to this evidence, the State has offered the testimony of Mr. Hatley N. Harrison, a Civil Engineer and Surveyor, who was requested by the State to examine the nature of the water bottoms in question and determine their navigability. It is upon his examination and findings that the State lays claim to the water bottoms which were determined to be navigable. Mr. Harrison went into the area twice, once in 1966 and again in 1968, and based his conclusion as to navigability on the premise that any water that would float a pirogue was navigable. His findings as to depth, when adjusted for variables, corresponds to some degree with the findings of Mr. Burke. We find particularly illuminating the fact that on his first attempt to approach the area, he attempted to enter the Marretta Congo with a 32' boat which immediately went aground in six inches of water and was stranded most of the day until rescued by a nearby fisherman in a pirogue who brought help for them. Upon getting free of the mud, he retraced his path back the way he came through Lakes Petit and Grand Lake and then approached the area from the western side by the oil company canal dredged there. He then entered into the Marretta Congo through the dredged canal until he was near the well drilled in that unit. However he did not take any soundings and stayed within the confines of the dredged canal. On the last occasion, he entered the Lost Lake area, but this time took the obviously wise precaution of using a 14' aluminum hull and outboard motor. Access was obtained by using the pipeline canal running into the area, and after taking one sounding of two feet in the unnamed water below Lost Lake, he entered Lost Lake and took soundings ranging from three to five feet. These soundings were based on actual water depth at high tide. He testified that the usual tidal flow in that area was about six inches.
The other witness for the State was Dr. Theodore Ford, Professor of Marine Science, who entered the area by airplane the week before trial date. His purpose was not to ascertain navigability, only to ascertain suitability for oyster cultivation. His examination was only of one spot in Marretta Congo, where he simply determined whether the bottom was hard enough to support oyster cultivation. Based upon data that had been collected from the Grand Lake, Alligator Pass, Lake Petit area, he felt that there was a tidal flow into the area, and that the salinity of the water was such as to support oyster growth.
We are of the opinion that the evidence overwhelmingly shows that the water bottoms of the Lost Lake and Marretta Congo areas were not navigable in 1902, and have never been navigable up to the present time. The only things that make it possible to get into the region now with something other than a pirogue are the privately dredged oil company canals running through the area. We cannot accept the State's premise that any body of water deep enough to float a pirogue is navigable under Louisiana law. In State v. Capdeville, 146 La. 94, 83 So. 421 (1919), the court, in determining what is navigable water, stated that navigable water is that which by its depth, width and location is rendered available for commerce.
The case of Burns v. Crescent Gun and Rod Club, 116 La. 1038, 41 So. 249 (1906) is a clear demonstration of the difference between navigable waters belonging to the State and nonnavigable waters susceptible of private ownership. In that case several *853 bodies of water were considered as here, all of which were connected. That court held Irish Bayou to be navigable water (the Bayou was 200' in width, 15' in depth, was directly connected to Lake Pontchartrain, and was historically useful to vessels of large size) and then held that Irish Lagoon, Little Irish Bayou, Second Branch Bayou and Bayou Castiglione were nonnavigable and subject to private ownership. This determination of nonnavigability was reached despite factors of (1) being affected by ebb and flow of tide; (2) existence of a few feet of water; (3) communication with the lake; and (4) periodic entrance by fishermen to fish in skiffs. The court summed up: "Navigable means when a stream is large enough to float a boat of some size, engaged in carrying trade. It implies a possibility of transporting men and things."
In State v. Sweet Lake Land and Oil Company, supra, the court held nonnavigable a lake of 1800 acres, being three miles long and a mile and three tenths in width. The lake had an average depth of four feet and was situated about 15 miles from the Gulf of Mexico. As is readily apparent, this body of water is much larger and deeper than the bodies in question here. A finding of nonnavigability was based upon 1) location within the land of one owner; 2) watercraft use limited to pirogues despite the average depth of 4 feet of water; and 3) the fact that the lake, in its natural and ordinary condition did not lie along a route of water commerce. These findings, when compared to the water bottoms here in question, show the latter to be even less susceptible to a declaration of navigability.
For these reasons, we conclude that the water bottoms in question, that is, the areas of Lost Lake and Marretta Congo, and other water bottoms within the areas of sand unit A and sand unit B are not navigable waterways, and were susceptible of private ownership at the time of the transfer from the Levee Board to Estopinal, and indeed at the time of the mineral leases made herein.
The last issue before us is the application of the so-called Oyster Acts. It is contended that Act 153 of 1902 and Act 189 of 1910 each has the effect of affirming the State ownership of all water bottoms bordering or connecting with the Gulf of Mexico, and prohibits any official from disposing of those water bottoms other than as specified in the Act. Hence it is argued that the conveyance to Estopinal in 1902 and the transfer by the Auditor from the State to the Levee Board were transfers in violation of the provisions of these Acts. As noted above, it would appear that our decision in the Winkler case, supra, would require us to hold that the State Auditor did not possess the authority to transfer oyster water bottoms to the Levee Board. However, because of the provisions of Act 316 of 1926, it is our opinion that the Estopinal title stands or falls upon the situation in 1902 when conveyance was made to him.[1] Thus the 1902 Act is pertinent and we shall consider only it.
The purpose of Act 153 of 1902 was to establish, regulate and protect the oyster fishing industry in this State. The Legislature obviously determined that it was necessary that the water bottoms should be owned by the State and open to use by the general industry, and provides for an orderly method of leasing of certain areas for peaceable and continued production of oysters. The precise issue here is the determination of whether the water bottoms here contended for fall within the description of the water bodies intended to *854 be retained by the State. Since the wording of the Act is such that all of the beds of water bottoms bordering on or connecting with the Gulf of Mexico are claimed by the State, it is contended that the Act is very indefinite and since nearly every water bottom of any consequence is connected to the Gulf of Mexico through some manner of means, this encompasses every water bottom in the State, no matter how remote.
We consider that there are two major limitations apparent in the Act restricting the geographical area to which it applies.[2] First, the Act itself states that the water bottom must border on or connect with the Gulf of Mexico. Second, the purpose of the Act is such that it intends to encompass only those water bottoms which may reasonably be considered as suitable for oyster cultivation.
We hold that Act 153 of 1902 does not apply to the disputed water bottoms here because the facts in this record do not show that they bordered on or connected with the Gulf of Mexico during the pertinent periods. A simple glance at the maps placed in evidence shows that these water bottoms are well over 50 miles from the Gulf and that they are separated by numerous intervening bodies of water and by marshland. The serious dispute is that of a connection with the Gulf.
In this respect we have already discussed at length the nature of these water bottoms and the evidence pertaining thereto in our discussion of navigability. Although we believe it to be extremely important to the factual determination here, we see no necessity to repeat it. We simply emphasize that the evidence elicited relative to nature of the water bottoms at the pertinent times of the various transfers was that these water bottoms were inaccessible, isolated, and subject to no regular tidal flow. The State Mineral Board is contending that the title of the private claimants is invalid and thus it appears that the burden of proof should be upon the Board to show the facts upon which the invalidity is based. However, the evidence here clearly preponderates in favor of the private claimants. The only way into this area was by pirogue, which must be transported or pulled across the marsh from place to place in order to get to the water bottoms in question. The evidence disproves that the water bottoms were connecting with the Gulf as required by the statute. Based upon these factual determinations we conclude that the provisions of Act 153 of 1902 do not apply to the water bottoms in question, and the transfer to Estopinal was not prohibited by the operation of that act.
Since we reach this conclusion we find it unnecessary to make a determination of the suitability of these water bottoms for oyster cultivation at the pertinent times, although we must note that the Board introduced only evidence of partial suitability, as of date of trial.
We find that there was no impediment to the passage of title to Estopinal except that cured by the operations of Act 316 of 1926.
For the reasons hereinabove expressed, the judgment appealed from is affirmed and whatever costs may be legally assessable are assessed against the appellant.
Affirmed.
NOTES
[1] Because of the chronology of the various transfers we have examined the prior oyster acts, Act 105 of 1886, Act 110 of 1892 and Act 121 of 1896. These acts refer only to beds of waters "bordering on the Gulf of Mexico" and of the Gulf itself. We note with interest that Act 105 of 1886 included the beds of "sea marshes" which were omitted from the later acts. We do not consider that these acts apply to the area here which does not border on the Gulf of Mexico.
[2] Since Act 189 of 1910 contains essentially the same wording, it would appear to be subject to the same limitations.