597 So.2d 65 (1992)
DELACROIX CORPORATION
v.
JONES-O'BRIEN, INC. and Martin Exploration Company.
No. 91-CA-0851.
Court of Appeal of Louisiana, Fourth Circuit.
March 17, 1992.
Rehearings Denied May 13, 1992.
*66 Hugh M. Wilkinson, Jr., Wilkinson & Wilkinson, New Orleans, for plaintiff-appellee.
Edward B. Poitevent, II, Carl D. Rosenblum, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for appellee.
Glenn L. Langley, Hargrove, Guyton, Ramey and Barlow, Shreveport, John F. Wadsack, The Carmouche Law Firm, Lake Charles, Jackson M. Cooley, Amoco Production Co., Houston, Tex., Richard S. Pabst, New Orleans, George Pivach, II, Anne Derbes Keller, Pivach, Cossich & Pivach, Belle Chasse, William J. Guste, Jr., Atty. Gen., Gary L. Keyser, Asst. Atty. Gen., David C. Kimmel, Asst. Atty. Gen., Baton Rouge, for appellant.
Blake G. Arata, Steven W. Copley, Gordon, Arata, McCollam & Duplantis, New Orleans, for defendant/appellant.
Before KLEES, BYRNES, and JONES, JJ.
JONES, Judge.
Defendant, the State of Louisiana, together with other defendants, appeal the trial court's judgment finding that the bed and bottom of Lake Quatro Caballo was not state property. Defendant, Jones-O'Brien appeals the trial court's ruling finding it was not entitled to reimbursement for drilling and operating cost. We affirm the trial court's judgment.
On May 29, 1979, Delacroix Corporation, "Delacroix", filed an action to be recognized as the land-owner of 42.3773% of the Unit consisting of portions of Township 16 South and to order Jones-O'Brien to pay royalties to Delacroix. Jones-O'Brien was operating in good faith under a perfected lease of the unit from the estate of Winnifred Smith and others (referred to in the Judgment as "A. Bart Brown Group") and had been paying royalties accordingly to its lessees. The issue raised by the ownership of the land comprising the Unit was the location of a township line dividing Township 16 South from Township 15 South. Basically, Delacroix Corporation asserted that the township line was north of the position that Jones-O'Brien and the A. Bart Group asserted. That disputed area amounted to 42.3773% of the Unit.
Accordingly, on January 12, 1979, Jones-O'Brien filed a Concursus Proceeding, depositing *67 all of the revenue from the production of the disputed area from April 1, 1979 into the Registry of the Court. All interested parties were joined in the Concursus Proceeding, including ATC Realty Eight, Inc. as successor to Martin Exploration Company, the mineral lessee of Delacroix, Texaco Corporation, the State of Louisiana and other parties.
The court bifurcated the trial with the first hearing limited to the township line issue and the survey thereof. The survey issue was tried and the court rendered a decision in favor of Delacroix. This portion of the judgment is not being appealed by any of the parties, however in a motion for new trial or, alternatively, amendment of the judgment, Jones-O'Brien asserted that the trial court should have deducted production and operation costs from the revenue deposited with the registry of court. The trial court denied Jones-O'Brien's motion and Jones-O'Brien appeals this issue. The result of the survey issue made necessary the second hearing, that of whether the bed of Lake Quatro Caballo, contained within the unit, was owned by the State of Louisiana or was in the private domain. The court found that the State of Louisiana holds no ownership of the bed and bottom of Lake Quatro Caballo. The State of Louisiana appeals and Jones-O'Brien, Texaco, Amoco, and the overriding royalty owners join in its appeal and stipulate to its brief.

I
The State claims that the trial court erred in finding that it had no ownership right in the bed and bottom of Lake Quatro Caballo in three respects: 1) in ruling that the bed and bottom of Lake Quatro Caballo was non-navigable in 1812 or in 1902; 2) in ruling that Lake Quatro Caballo was not subject to the ebb and flow of the tide of the Gulf of Mexico in 1812 or in 1902; and 3) in applying Act 62 of 1912 to the facts of this case irrespective of navigability.

NAVIGABILITY
The State contends that it acquired ownership of the bed of Lake Quatro Caballo as sovereignty lands because the lake was navigable in 1812 when Louisiana was admitted to the Union; and if not navigable in 1812 that the lake became navigable by 1902 and the purported alienation into private domain in that year was null. The State submits that in order to establish navigability its only burden is to show that a particular waterbody has sufficient depth to support commercial use given the time and place at issue. The key is the waterbody's susceptibility to support whatever commercial activity is normal for that particular area.
Relying on State v. Sweet Lake Land & Oil Co., et al, 164 La. 240, 113 So. 833 (La.1927), the trial court observed in its reasons for judgment that the characteristics of Sweet Lake, cited by the Supreme Court as supporting non-navigability, are significantly present with respect to Lake Quatro Caballo. Paramount among these facts were isolation and the failure of all but a very few persons to have knowledge of the lake's existence.
Also in its reasons for judgment the trial court embraced the expert opinion of Dr. Sherwood Gagliano, who testified that in 1812 the area of present day Lake Quatro Caballo was an isolated fresh water marsh. He reasoned that the lake may have existed in the form of small marsh ponds, four in number, which consolidated with the passage of time. To support his opinion he relied on published and accepted works of other recognized expert geomorphologists, including an actual map of an oval pond made by deputy surveyors in 1846. He also pointed to such physical evidence as the four outlet streams and the footprint of the pond in the margin of the present lake.
To satisfy its burden the State relies on the testimony of its own expert, Mr. Charles H. Coates, Jr., offered at trial to prove that at the time in question Lake Quatro Caballo was a navigable lake. The State insists that the testimony of its expert witness, Mr. Coates, directly refutes the trial court's findings. Mr. Coates testified that the existence of the lake can be confirmed in two different ways: first, by examining the area and its consistent history for the past century; and secondly, by *68 calculating subsidence over the years to determine the depth of the waterbody at the time in question.
In his consideration of the area, Mr. Coates determined that the area surrounding Lake Quatro Caballo remained consistent for over 100 years. He compared the first true depiction of the area in 1932 with the earlier depiction on the township plat and upon placing the various marks in proper location concluded that a striking similarity existed between the two.
Using a subsidence figure supplied by Delacroix's expert, Dr. Gagliano, Mr. Coates then calculated a depth of the waterbody in 1812 of 4.852 feet. The State contends that this is sufficient for navigability in 1812 when one considers that in this locality commercial use of the water would entail such activities as hunting, trapping and fishing. The State challenged the trial court's depth projections arguing that it relied on the Garret survey which does not cite any tidal data from which a proper reference to water elevation can be made.
The trial court held that the State's expert witnesses were not qualified to give valid opinions on the geomorphological processes of the land development and later deterioration. The trial court found that the State's primary witness, Mr. Coates, gave a programmed delivery which did not add to the weight of his evidence. When questioned, Mr. Coates conceded that he had not studied the meandering of rivers, geology/geomorphology, hydrology, or stream bank erosion in the wetlands of Louisiana to the extent that he could be recognized as an expert in those areas. Mr. Coates relied heavily on historical references and his interpretation of them differed with Dr. Gagliano's interpretation. When discussing the Gauld Map, Dr. Gagliano observed that it was the tendency of map makers of that day to put legends, make drawings of fish, animals, mud lumps or to write generalized statements that were in error. It is clear that the trial court made a credibility determination in adopting the expert opinions of Dr. Gagliano.
The trial court further found no validity to the State's position that there was minimal difference in Lake Quatro Caballo between 1848 and 1932. The court noted that the evidence the State's witnesses relied on, the 1848 survey plats, are inadequate to substantiate the State's position because the Deputy Surveyors did not traverse any interior area that could be compared to the Lake Quatro Caballo site. Further, the court rejected Mr. Coates' theory that the depth of Lake Quatro Caballo could be hindcast to 1812 on a ratio in conformity with the .007 feet per year subsidence rate of the region. Such a formula would derive an inaccurate present depth of the lake.
The State concedes that even today the lake is small and shallow. Acreage and depth of the lake for the relevant times, 1812 and 1902, had to be deduced by the experts because the evidence in existence does not accurately depict the area in question. This is not a case where there is an overwhelming amount of evidence available. Both sides presented what evidence they could regarding the origin and evolution of the lake. The trial court simply found that the weight of the evidence was in Delacroix's favor. All of the trial court's conclusions are supported by the record. We find no error on the part of the trial court.

EBB AND FLOW OF TIDE
In the alternative, the State argues that, irrespective of navigability, Lake Quatro Caballo was subject to the ebb and flow of the tide of the Gulf of Mexico in 1812 and was thereby a part of the sovereignty lands acquired by the State on admission to the Union and for that reason the 1902 purported alienation was null. The State relies on such documents introduced at trial as the Tilghman Report, the Graham account, the 1973 USGS Quadrangle Map, the Gauld Map and Pussin Maps which all indicate tidal influence. The State claims that historical references to the tides in several accounts date back as far as the late 1700s.
Delacroix responds that the geomorphological history of the St. Bernard and *69 Plaquemines Parishes Delta, east of the present Mississippi River Channel, establishes that in 1812 the incipient Lake Quatro Caballo area was a fresh marsh, remote from the salinity or tidal ebb and flow of the Gulf of Mexico waters. Based on testimony offered by Delacroix's experts, particularly Dr. Gagliano, the trial court essentially adopted the position that Delacroix postures.
The trial court observed that the State failed to produce credible evidence that there was a tidal ebb and flow effect in Lake Quatro Caballo prior to 1902. No oyster leases were granted in Lake Quatro Caballo until 1974. The presence of peat in the bed of the lake and Dr. Gagliano's study of natural levees through the entire Delacroix Basin, led him to conclude that until quite recently the fresh water lake had not been subject to the penetration of salt water through tidal ebb and flow.
ATC Realty Eight, Inc., "ATC", formerly Martin Exploration Company, "MECO", was the lease holder to two oil and gas and mineral leases from Delacroix Corporation. Its position on appeal is identical to Delacroix's. ATC claims that the case presents an issue of conflicting expert testimony. The State substantially relies upon the credibility and conclusions of Mr. Charles Coates. The trial court found Mr. Coates's conclusions speculative and not based on actual facts elicited at trial. ATC argues that the findings of the trial court regarding a witness' credibility are entitled to great weight. Crane Supply Co. v. Drake and Planche, Inc., 255 So.2d 188 at 191 (La.1971). Finding no manifest error, the trial court should be affirmed.

APPLICATION OF ACT 62 OF 1912
Finally, the State argues that Act 62 of 1912 (the statute of repose) does not apply to the facts of this case, irrespective of navigability of the Lake. The State further submits that the trial court limits the provisions and pronouncements of the Louisiana Supreme Court in Gulf Oil v. State Mineral Board, 317 So.2d 576 (La. 1974) which held patents conveying state property to private individuals are ineffective insofar as they purport to alienate the beds of navigable water bottoms and that Act 62 of 1912 did not have the effect of ratifying such absolutely null transfers.
Act 62 of 1912, La.R.S. 9:5661, provided to the State six years, and no more, within which to "vacate or annul" any State patent or any transfer by a subdivision of the State. Citing Humble Oil & Refining Co. v. State Mineral Board, 223 La. 47, 64 So.2d 839 (La.1953), "The Duck Lake Case", and Realty Operators v. State Mineral Board, 202 La. 398, 12 So.2d 198 (La. 1942), the trial court distinguished Gulf Oil from the instant case because here we are involved with an inland waterbody as opposed to a "sea bottom". The State argues that the trial court misinterpreted the Gulf Oil decision.
The State insists that under Gulf Oil, it is not that a waterbody is considered a "common thing" that merits the public trust doctrine, but that it is a "public thing" owned by the State for the benefit of all citizens as expressed in our Civil Codes dating back to 1808. See: Yiamopoulus, Civil Law Property, Section 41 (2d Ed.1980). The State claims that this prohibition against the alienation of a public thing as being in the public trust has been expressed in State v. Bayou Johnson Oyster Co., 130 La. 604, 58 So. 405 (1912). Furthermore, the State urges that La.Civil Code Art. 450 provides that the bottoms of natural, navigable waterbodies are considered public things.
In closing, the State argues that Act 62 of 1912 is a prescriptive statute and should be strictly construed. Allstate Credit Plan of Natchitoches, Inc. v. Ratliff, 279 So.2d 660 (La.1973). The State submits that the intent of the legislature regarding patents and navigable water and beds thereof is made clear in Act 727 of 1954, La.R.S. 9:1107-9:1109. Patents purporting to transfer navigable waterbottoms are absolutely null. The State urges that the cases of Duck Lake and Realty Operators are not controlling law on this issue since they preceded the Supreme Court's decision in Gulf Oil.
*70 Delacroix responds that the Duck Lake case is an exact parallel factual situation to the instant case and they are distinguishable from Gulf Oil. The rationale of the Supreme Court in deciding Gulf Oil was to extend the definition of "sea shore" from the shore itself to encompass the bottom of the sea or an arm of the sea. This rationale cannot be used to embrace the bed of a marsh interior navigable lake such as Lake Quatro Caballo. Nor does the Civil Code make lakes common or public things.
Furthermore, Delacroix argues that the United States Supreme Court's decision in Phillips Petroleum Company & Cinque Bambini Partnership v. Mississippi & Saga Petroleum U.S., Inc., 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988) sets the stage for disruption of land titles across all Louisiana wetlands if the courts do not uphold the Realty Operators and Duck Lake decisions. That decision held that the State of Mississippi ownership of sovereignty waterbottoms acquired on admission to the Union extended to the limits of effect of the tide, through marsh and into the barest depths of waters. As the trial court stated in its reasons for judgment,
... Phillips Petroleum Co. is the ultimate justification for the wisdom of the 1912 Legislature in their adoption of Act 62 of that session. But for the legislation every private domain owner of an opening in the marsh, large owners and small, would need to stand ready to litigate on the level of the instant case, and produce like expert testimony on a complicated historical subject, or forfeit their ownership to State claims which had been allowed to lie dormant for nearly a century.
We agree with the trial court's application of Act 62 in the instant case. This case is distinguishable from Gulf Oil. We also find that Phillips Petroleum Co. is not controlling. Any other conclusion would be contrary to the objectives of Act 62.

II
Jones-O'Brien claims that it deposited the funds relating to the disputed area with the registry of the court. It claimed ownership to all funds deposited and put at issue all aspects relating to the funds.
Jones-O'Brien cited Louisiana Code of Civil Procedure article 4656 which provides:
No exceptions or responsive pleadings may be filed to the answer of a defendant and every factor alleged therein is considered as denied or avoided by effective law as to all other parties.
Jones-O'Brien maintains that in contests over funds deposited in the court that specific pleadings do not have to be filed to enumerate every defense to specific claims. State v. Alexander, 31 So. 60 (La.1901).
ATC responds that La.C.C.P. article 4651 is clear: A party in a concursus proceeding is "required to assert [its] respective claims contradictorily...." Jones-O'Brien simply failed to assert its claim to the alleged "credit". ATC argues that having failed to make the allegation to this "credit" timely and properly, Jones-O'Brien has waived its claim to this credit and the trial court was not manifestly erroneous in denying Jones-O'Brien's Motion for New Trial. See: e.g., Poynor v. Cure, 443 So.2d 1151, 1159 (La. App. 5th Cir.1983); Olivedell Planting Co. v. Town of Lake Providence, 47 So.2d 23 (La.1950). ATC further argues that even if Jones-O'Brien was not obligated to raise the issue of drilling and operating costs in the pleadings, it most certainly was obligated to raise those issues at trial of this matter, or at least obtain a reservation from the court by preserving its right to address that issue at a later date. Additionally, ATC contests whether Jones-O'Brien is entitled to a credit. ATC states that it acquired the interests of MECO in the relevant leases and this lawsuit by virtue of a "Settlement Stipulation" and certain "Acts of Sales" which grew out of the Chapter 11 reorganization proceeding of MECO. Since MECO filed for bankruptcy on July 16, 1982, in the event that Jones-O'Brien would have been entitled to seek reimbursement of drilling and operating costs, it would not have the right to unilaterally offset those costs. Rather, it would be obligated to file a claim against this alleged pre-bankruptcy liability in the MECO bankruptcy proceeding.
*71 Still further, Jones-O'Brien also failed to identify or file any documentary evidence which allegedly addresses the drilling and operating cost issues.
Finally, if Jones-O'Brien believed it was entitled to at least a portion of the oil and gas revenues, it should not have deposited those amounts into the concursus fund, since under Jones-O'Brien's current reasoning, there were no "competing or conflicting claims' as to those amounts. See cf. Louisiana Intrastate gas corporation v. Muller, 290 So.2d 888, 895-896 (La.1974); Austral Oil Co., Inc. v. Milliken & Farwell, Inc., 307 So.2d 377, 379 (La.App. 1st Cir.1974) writ denied, 310 So.2d 642 (La. 1975).
ATC's argument regarding the contradictory assertion of claims in a concursus proceeding has merit. By failing to raise this issue in pleadings or at trial, this court lacks any documentary evidence of the claim. We find no manifest error with the trial court's judgment. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); See also: Canter v. Koehring Co., 283 So.2d 716 (La.1973).
AFFIRMED.